Arthur HUGHES et al., Appellants,

v.

The BOARD OF TRUSTEES, TARRANT
COUNTY JUNIOR COLLEGE
DISTRICT, Appellee.

No. 17300.

Court of Civil Appeals of Texas,
Fort Worth.

April 14, 1972.

Rehearing Denied May 19, 1972.

Marvin Collins and Schattman, Mock &
Guthrie, and Denning Schattman, Fort
Worth, amicus curiae and for appellants.

Law, Snakard, Brown & Gambill, and Thos. H. Law, Forth Worth, for appellee.

## OPINION

PER CURIAM.

This appeal is from a temporary injunction. The Court found that the defendants had "engaged in unlawful, violent, threatening, and disruptive conduct on the South Campus of Tarrant County Junior College," and temporarily enjoined them from such unlawful conduct.

The plaintiff, The Board of Trustees, Tarrant County Junior College District, and the defendants, Arthur Hughes et al., will be referred to in this opinion as appellee and appellants, respectively.

In order to clarify the situation leading to the issuance of the temporary injunction the facts appearing in the record are summarized as follows: on October 15, 1971, at about 10:00 or 10:15 A.M., about 75 students appeared in the hallway of the Administration Building on the South Campus of Tarrant County Junior College, outside the offices of the President, the Dean of Instruction, and the Dean of Student Services. Dean Van Cleef went to the hallway and was advised by the group that they wanted "to speak to everyone in the Administration Building." Van Cleef suggested that they proceed to the Student Center where there would be enough room for discussion. Before leaving for the Student Center several students then went to the office of Dr. Dan McLallan, Dean of Instruction, and said to him, "We want you to come along too, Whitey."

At the Student Center, the group referred to increased to about 125. "And, there was a great deal of confusion and noise . . . . " One of the defendants, Madison Hogan, started the meeting by saying, "We've come, not to talk with you fellows, not to have requests with you, not even to give demands, but to tell you how it's going to be."

Another defendant, Arthur Hughes, interspersed his talk "with many obscene, vulgar and threatening kinds of words." He said, "You have a student who is coming before the discipline committee tomorrow. This student will not be dismissed from classes at TCJC. If so, there will be problems and troubles at TCJC." He also stated that, "If one of the black students on this campus is dismissed, all of the black students on the campus will have to be dismissed, and before we go, we're going to make problems for TCJC," and "that there would be no more TCJC when they went." In reference to a particular teacher, he said "we would get his white ass." He claimed that there were "some teachers on the campus who were white racists" and that if they "were not fired immediately that the whole black student population would have to be dealt with."

Another defendant, Kelly Scott, "then took over the meeting and made a lot, a number of statements regarding white racist teachers and wanting them fired. He spoke in a very emotional and very angry voice," came up close to Dr. Van Cleef who testified that Scott "pointed at me with a paper that he had in his hand, and indicated that he was sick of me and that they would not be satisfied until I was gone, and they were going to get me. . . His tone was very loud and very angry, and the group cheered, a number of them stood and showed the black power sign." When Scott said: "I will not stop until I get you", the crowd became quite agitated, began to give black fists salutes and began to yell obscenities of this nature.

Hughes then spoke again and "indicated again that they were tired of talking to us, and they were going to take things into their own hands and that they just didn't want to talk any more. . . . We're telling you how things are going to be, we're tired of talking to you, we will handle things in our own way with our methods."

" . . . the meeting was highly emotional, . . . it was best characterized as being a climate where there were inciting

kind of threatening statements being made, . . . hardly an atmosphere for trying to accomplish anything productive." The faculty members were not permitted or invited to talk. ". . . the tone of the whole meeting was demanding, threatening, highly stated, agitated."

The following questions and answers appear in the Statement of Facts:

"Q. Now, Dr. Van Cleef, it is necessary that I ask you if you will repeat verbatim, please, the profanities and obscenities that you say did take place, and that the students engaged in during the meeting.

"A. I — — — You want me to say it exactly as they — — —

"Q. — — — Yes — — —

"A. — — — The words as they used them — — —

"Q. — — — To repeat into the record the words which were used in reference to obscenities and profanity and that sort of thing.

"A. The words, 'mother fucker, fuck, shit, fucking shit, and white racist pig' were terms that were thrown out frequently."

The events above described occurred on Friday, October 15.

On Saturday, the Discipline Committee proceeded with its duly scheduled meeting and after a full hearing, it voted to suspend James Stein. This was the student Arthur Hughes referred to when acting as spokesman for the group assembled in the Student Center and threatened reprisal action in the event of his dismissal by the Committee.

Monday, October 18, was the next school day following the Friday confrontation and the Saturday meeting of the Discipline Committee. As defendants, Madison Hogan, Lester Hays, Arthur Hughes and Kelly Scott, had threatened on the previous Friday they and their followers did "take

things into their own hands" on Monday and proceeded to "handle things in (their) own way with (their) own methods" and "make problems for TCJC." Their threats of violence on Friday were followed up with acts of violence on Monday.

First, a group of students went through the cafeteria line at the Student Union Building and got cups of ice which they carried up to the overhanging balcony on trays, each tray holding "anywhere from a dozen to twenty cups of ice on it." They began by throwing ice, cokes, icetrays, trash cans and chairs off the balcony onto the floor below, where students were peacefuly assembled. After awhile they ceased, but then they regrouped. They were heard to say, ". . . we're going to throw everything off; going to throw chairs, coffee tables, everything."

In the second barrage, "they were aiming at people, trying to hit people." Among other objects, they threw a six-foot coffee table over the balcony. "It landed right beside" students who were seated below. Several students were struck by various objects thrown at them. A student who went upstairs "To see if I could stop it, or help stop it, because there were people that were going to get hurt," was set upon by the rioters, beaten, hit in the eye and kicked in the chest. They tried to throw him over the side of the balcony. He was "hanging onto that balcony like it was his last hope."

During the rioting, a plate glass door was broken by an ashtray which was kicked into it. Another object was thrown from the outside, breaking a large pane of glass in the lobby of the Student Center, "shattered glass in several directions, nearly hitting students." Numerous chairs, trash cans, and large ashtrays were broken. This destruction is clearly revealed by the photographs which are in the record.

After things had quieted down, some of the group said, ". . . they weren't going to stop until a certain student was

readmitted and some of their demands were met; they would keep this up."

While it was difficult to identify the rioters amid the confusion created by them, the defendants, Madison Hogan, Lester Hays, Dave L. Jennings and Kelly Scott, were all identified. Madison Hogan was one of those who beat up the student and tried to throw him over the side of the balcony. Lester Hays threw furniture over the side and Dave L. Jennings smashed a glass object to the floor and broke it.

Kelly Scott was present during the rioting. He denied participating in it. He did nothing in an attempt to stop it, even when the faculty member to whom he was speaking made an attempt to rescue the boy who was being beaten up by Madison Hogan and others.

In view of the threats and verbal abuse by Hogan, Hughes, and Scott on October 15; the rioting, physical violence and destruction of property by Hogan, Hays and Jennings on October 18; and the assurance by the rioters, both before and after the riot, that "they weren't going to stop . . . they would keep this up," the Junior College Board of Trustees employed the mildest remedy available to restore and maintain law and order and to protect the school property. Criminal charges were not instituted against any of the leaders. No one was placed under arrest.

The appellee was under obligation to make the campus safe for the students who were seeking an education and the faculty who were teaching them. In meeting this obligation it filed a civil suit for injunction in an attempt to prevent the repetition of such unlawful conduct.

■ We overrule appellants' first three points of error because in our opinion the First and Fourteenth Amendments to the United States Constitution do not guarantee students the right, in violation of a state statute, to (1) threaten, curse and abuse their deans; (2) threaten to "handle things in our own way with our own meth-ods" and "make problems for the college" if the Discipline Committee acts to dismiss a student, regardless of the merits or reasons for such action against that student; and (3) threaten the college with violence unless certain named faculty members are "fired immediately" without inquiry.

The main thrust of the appellants' contention is that the abuse of Dr. Van Cleef and Dr. McLallan, the boisterous and profane language and the threats of and inciting to violence which occurred on the Junior College campus could not legally be enjoined because to do so would violate their constitutional rights.

In support of their position they cite Tinker v. Des Moines School Dist., 393 U. S. 503, 21 L.E.2d 731, 89 S.Ct. 733; and Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, neither of which involved any violence or any threat of violence.

In Tinker, the court said the case did "not concern aggressive, disruptive action or even group demonstrations. (p. 508, 89 S.Ct. p. 737) . . . the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it. (p. 505, 89 S.Ct. p. 736) . . . this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students. (p. 508, 89 S.Ct. p. 737) . . . there were not threats or acts of violence on school premises." (p. 508, 89 S.Ct. p. 737)

The court further said at p. 509, 89 S.Ct. at p. 738: "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the

operation of the school,' the prohibition cannot be sustained. Burnside v. Byars, supra, 363 F.2d at 749.

"In the present case, the District Court made no such finding, and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students."

In the case at bar there was "more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." There was conduct which "would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,'" and "impinge upon the rights of other students."

In Cohen the court said, " . . . Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction. Cf. Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951); Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). There is, as noted above, no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result."

The trial court in considering the testimony in the case at bar could readily find support for holding that the appellants did intentionally provoke the group to hostile action. Those who were present on October 15 were, under the facts presented by this record, violently aroused, shouting epithets and giving what is currently referred to as the black power salute. On the next school day, they followed through on the threats of violence because the Discipline Committee acted against James Stein in a manner which was not satisfactory to them. On their initiative there was "trouble at TCJC" as they had threatened there would be.

■ Based upon our review of the entire record in this case we find and hold that there was ample evidence to justify the issuance of the temporary injunction against the appellants. The appellee clearly met the test of showing a probable right and probable injury.

The facts which gave rise to the temporary injunction fully justify the action taken by the court to protect the Junior College, its students and faculty.

In Cox v. Louisiana, 379 U.S. 536, 85 S. Ct. 453, 13 L.Ed.2d 471, the court said:

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy."

In Ferrell v. Dallas Independent School District, 392 F.2d 697 (5th C., 1968, cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed. 2d 125), the Fifth Circuit held:

"That which so interferes or hinders the state in providing the best education possible for its people, must be eliminated or circumscribed as needed. This is true even when that which is condemned is the exercise of a constitutionally protected right."

In recent cases of student disorders on state university and college campuses, the courts have uniformly held that disruptive conduct is not cloaked with any constitutional privilege because protest was its asserted justification. Buttny v. Smiley, 281 F.Supp. 280 (D.Colo.1968); Greene v. Howard University, 271 F.Supp. 609 (D. D.C., 1967); Zanders v. Louisiana State Board of Education, 281 F.Supp. 747 (W. D.La.1968); Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal.Rptr. 463 (1967).

"To warrant the issuance of a temporary injunction the applicant need only show a probable right and a probable injury. He is not required to establish that he will finally prevail in the litigation." Granbury Independent School District v. Andrews, 439 S.W.2d 896 (Fort Worth Civ.App., 1969, ref., n.r.e.). Additional authorities include Metropolitan Construction Company v. White, 438 S.W.2d 433 (Fort Worth Civ.App., 1969, no writ hist.) and American Institute of Real Estate Apprais. v. Hawk, 436 S.W.2d 359 (Houston Civ.App., 14th Dist., 1968, no writ hist.).

■ The probable injury can be established by virtue of a threat. In County of Harris v. Southern Pacific Transp. Co., 457 S.W.2d 336 (Houston Civ.App., 1st Dist., 1970, no writ hist.) the court said that, " 'Acts which destroy or result in a serious change of property either physically or in the character in which it has been held or enjoyed have been held to do an irreparable injury.'

" 'It has been uniformly held in this State that the trial court has the duty to grant temporary injunctions where there is substantial controversy and one party is committing or threatening immediate commission of any act which will destroy the status quo of the property involved before a full hearing can be had on the merits of the case.' " Appellants' points four and five are overruled.

We find and hold that the temporary injunction as issued is in all respects legally sufficient and thus overrule appellants' points six, seven and eight.

Appellants argue that the temporary injunction here involved fails to set out the reasons for enjoining defendants; is too indefinite and vague; and necessitates reference to other instruments for the determination of the acts prohibited.

The court found that defendants had engaged in the conduct complained of and would continue to do so unless restrained. This finding is supported by the appellants who said that they were through talking; that they would take matters in their own hands, and use their own methods; and that when they were through, there would not be any more TCJC. After having threatened violence on October 15 and having committed acts of violence on October 18, they had said, " . . . they weren't going to stop . . . they would keep this up."

With clarity and in detail the temporary restraining order enjoins appellants from engaging in ten acts of personal abuse and violence. It also enjoins them from violating the terms of Articles 295a and 474 (except Sections 7, 8 and 11) of the Vernon's Ann.Texas Penal Code; but the prohibited activities therein set forth are merely those listed seriatim in the preceding ten prohibitions. The order is more detailed and complete than is required. The reference to the Penal Code articles is mere surplusage.

■ The Supreme Court of Texas in the case of City of Irving v. Dallas County Flood Control Dist., 383 S.W.2d 571 (Tex. Sup., 1964) said that if the pleadings and evidence offer sound basis for the issuance of the temporary injunction, it will not be dissolved. This is true even though the reasons given in the order granting the temporary injunction are in fact erroneous.

Appellants rely upon cases holding that the requirements of Rule 683, Texas Rules of Civil Procedure, are not met, where no reasons are given for the granting of an injunction and there is no reference to the petition or record which will supply such information to the defendant. This was not the situation in the instant case. Eastex Wildlife Conservation Ass'n v. Jasper, Etc., 450 S.W.2d 904 (Beaumont Civ.App., 1970, ref., n.r.e.); County of Harris v. Southern Pacific Transp. Co., supra.

■ In cases such as is involved on this appeal where the public interest is involved, the requirements of Rule 683 are relaxed since such orders are designed to

protect the public. Davies v. Unauthorized Pr. Com. of St. Bar of Texas, 431 S.W.2d 590 (Tyler Civ.App., 1968, ref. n.r.e.). In this case the court said that, " . . . In framing the decree, doubt should be resolved in favor of the public and against the violator."

Counsel for defendants in his amicus curiae brief asserts that the defendant, Dave L. Jennings, was never served with citation and thus is not before the Court.

In overruling this contention we find and hold that the defendant, Dave L. Jennings, was properly served, had actual notice of the hearing and was thus subject to the jurisdiction of the trial court.

The record reflects that Dave L. Jennings has a twin brother whose name is David L. Jennings. Dave is a student at TCJC. David is not. The original petition and citation read "David." The sheriff reported that he had been unable to serve the citation and further, that the student at TCJC was called Dave. The petition clearly alleged that the party sought was a student at TCJC. The pleadings then were amended to read "David L. Jennings, also known as Dave L. Jennings." The defendant was so served.

Counsel contends that Dave L. Jennings, being a minor, could not waive citation. This is not in issue. Service was had under Rule 106. There is no contention that Rule 106 was not fully complied with. Upon motion, the Court authorized service under Rule 106 "by leaving a copy of the citation, . . . or by delivering same to any one over sixteen years of age at the party's usual place of abode, or in any other manner which will be reasonably effective to give the defendant notice of the suit." This was accomplished by leaving the copy with Dave's mother at his residence.

Counsel further contends that the twin David L. Jennings, not Dave L. Jennings, was served. This is in error. Assuming for the sake of argument that David L. Jennings is not also known as Dave, the fact remains that the defendant was clearly identified as being the brother who was a student at TCJC. This was Dave. Further, he had actual knowledge of the suit and the hearing on the temporary injunction.

The case of Thomas v. Cactus Drilling Corporation of Texas, 405 S.W.2d 214 (Austin Civ.App., 1966, no writ hist.) cited in appellants' brief has no application to the facts of this case.

■ The appellee in the instant case did not sue the wrong party. It sued the correct party under a wrong name. He was clearly identified as being the brother "also known as Dave . . . a student at Tarrant County Junior College." He was so served. Therefore, the right party having been served, the judgment granting the injunction should stand, notwithstanding the fact that such party was sued under an alias or a nickname.

■ The fact that appellee's petition stated that David L. Jennings is also known as Dave L. Jennings is of no consequence in view of the facts that (1) service was completed under Rule 106; (2) Dave was identified as being the twin brother referred to, by virtue of his identification as being a student at TCJC and the allegation as to his presence on the campus the Monday preceding (October 18, 1971); and (3) Dave had actual knowledge of the lawsuit, the citation and the hearing, itself.

The facts revealed by a review of the record in this case suggest that the appellants were not motivated by reason, truth or facts. They sought rule by the force of a mob. They were rude and indifferent to the rights of and to the safety of others. They resorted to threats of violence and coercion, rather than persuasion in obtaining their stated objectives.

All points of error are overruled. The action of the trial court in granting the temporary restraining order is in all things affirmed.