ACCEPTED
15-25-00100-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/30/2025 5:36 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00100-CV**

# In the Court of Appeals
# for the Fifteenth Judicial District

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/30/2025 5:36:01 PM
CHRISTOPHER A. PRINE
Clerk

————

MARIA MARGARITA ROJAS; MATERNAL AND CHILD HEALTHCARE
AND RESEARCH CENTER LLC D/B/A CLINICA LATINOAMERICANA;
CLINICAS LATINOAMERICANAS; CLINICA-WALLER
LATINOAMERICANA; CLINICA-TELGE LATINOAMERICANA A/K/A
CLINICA DE LA MUJER A/K/A HOUSTON BIRTH HOUSE,

*Appellants*,

*v.*

STATE OF TEXAS,

*Appellee.*

————

On Appeal from the
506th Judicial District Court, Waller County

————

## BRIEF FOR APPELLEE

————

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

JEFFREY A. STEPHENS
Assistant Solicitor General
State Bar No. 24117441
Jeff.Stephens@oag.texas.gov

BETH KLUSMANN
Assistant Solicitor General

Counsel for Appellee

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page

Index of Authorities .................................................................................iii

Statement Regarding Oral Argument ....................................................viii

Issues Presented ........................................................................................ix

Introduction................................................................................................1

Statement of Facts ......................................................................................2

    I.   The State's Investigation..................................................................2

        A.  Rojas' clinics and the HHSC complaint .............................2

        B.  Evidence of abortions.........................................................3

            1.   Abortion-inducing drugs and fake identities ................3

            2.   Witness 1 .....................................................................4

            3.   Witness 3 .....................................................................5

        C.  Operation of the Rojas clinics ............................................7

    II.  The State's Lawsuit.......................................................................10

Summary of the Argument.......................................................................13

Standard of Review ..................................................................................15

Argument...................................................................................................16

    I.   Appellants' Rule 683 Arguments Do Not Warrant Reversal of the Temporary Injunction. ........................................................16

        A.  Appellants forfeited their objections to the temporary injunction..........................................................................17

        B.  The order sets forth its reasons for issuance.....................19

        C.  The trial court's temporary-injunction order is specific and describes in reasonable detail the acts restrained. ...........23

        D.  Appellants' invited error regarding the exclusion of a trial date does not provide a reason to reverse. ........................26

    II.  The Attorney General Has the Authority to Enforce the Laws Appellants Allegedly Violated.................................................28

        A.  The Attorney General may seek civil penalties and injunctive relief....................................................................................28

1. The Attorney General has the authority to enforce state law.........................................................................29

2. The Attorney General permissibly sought injunctive relief. ........ 31

B. The Attorney General may bring suit in the name of the State.........................................................................................35

III. The Trial Court Did Not Abuse Its Discretion in Enjoining Appellants from Performing Abortions or Practicing Medicine................37

A. The State's evidence reasonably supports the trial court's determination that the State is likely to succeed on its claims............37

1. Evidence supports the trial court's decision that the State is likely to succeed in showing that Rojas performed illegal abortions.............................................................................38

a. Evidence considered by the trial court ................................38

b. Appellants' evidentiary arguments .....................................43

c. Evidence that the trial court did not consider.......................45

2. Evidence supports the trial court's decision that the State is likely to succeed in showing Rojas and her clinics practiced medicine in violation of State law. ..............................................48

B. The performance of illegal abortions or practice of medicine without a license at Rojas' clinics demonstrates a probable, imminent, and irreparable injury. ....................................................50

Prayer ........................................................................................................52

Certificate of Compliance ........................................................................52

ii

# Index of Authorities

Page(s)

**Cases:**

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (Tex. 1943) .................................................................. 29, 31

*Baxter v. Palmigiano*,
425 U.S. 308 (1976)................................................................. 37, 39, 43, 45

*Bertucci v. Watkins*,
709 S.W.3d 534 (Tex. 2025) ..........................................................................26

*Breithaupt v. Navarro County*,
675 S.W.2d 335 (Tex. App.—Waco 1984, writ ref'd n.r.e.)....................17, 22, 25

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002) ............................................ 22, 31, 37, 38, 47, 48, 50

*Clark v. Hastings Equity Partners, LLC*,
651 S.W.3d 359 (Tex. App.—Houston [1st Dist.] 2022, no pet.)......................19

*Commons of Lake Hous., Ltd. v. City of Houston*,
711 S.W.3d 666 (Tex. 2025) .........................................................................29

*Cooper Valves, LLC v. ValvTechnologies, Inc.*,
531 S.W.3d 254 (Tex. App.—Houston [14th Dist.] 2017, no pet.)....................24

*Davies v. Unauthorized Prac. Comm. of the State Bar of Tex.*,
431 S.W.2d 590 (Tex. App.—Tyler 1968, writ ref'd n.r.e.)........................ 25, 26

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990).........................................................................37

*Forest Oil Corp. v. El Rucio Land & Cattle Co., Inc.*,
518 S.W.3d 422 (Tex. 2017) .........................................................................34

*Frey v. DeCordova Bend Estates Owners Ass'n*,
647 S.W.2d 246 (Tex. 1983) ......................................................................... 51

*In re DFPS*,
273 S.W.3d 637 (Tex. 2009) (orig. proceeding)..............................................26

*State ex rel. Downs v. Harney*,
164 S.W.2d 55 (Tex. App.—San Antonio 1942, writ ref'd w.o.m.) ..................34

*State ex rel. Durden v. Shahan*,
658 S.W.3d 300 (Tex. 2022) .................................................................... 35, 36

*El Paso Elec. Co. v. Tex. Dep't of Ins.*,
937 S.W.2d 432 (Tex. 1996) .........................................................................33

*Emerson v. Fires Out, Inc.*,
735 S.W.2d 492 (Tex. App.—Austin 1987, no writ) ....................................18, 19

*Exec. Tele-Commc'n Sys., Inc. v. Buchbaum*,
669 S.W.2d 400 (Tex. App.—Dallas 1984, no pet.) ......................................... 47

*In re G.X.H.*,
627 S.W.3d 288 (Tex. 2021) ....................................................................................26

*Good Shepherd Hosp., Inc. v. Select Specialty Hosp. - Longview, Inc.*,
563 S.W.3d 923 (Tex. App.—Texarkana 2018, no pet.) ..............................21-22

*Haedge v. Cent. Tex. Cattlemen's Ass'n*,
603 S.W.3d 824 (Tex. 2020) .................................................................................. 15

*Hill v. Lower Colo. River Auth.*,
568 S.W.2d 473 (Tex. App.-Austin 1978, writ ref'd n.r.e.) ..............................34

*Hoist Liftruck Mfg., Inc. v. Carruth-Doggett, Inc.*,
485 S.W.3d 120 (Tex. App.—Houston [14th Dist.], no pet.) .....................18, 19

*Hughes v. Bd. of Trs., Tarrant Cnty. Jr. Coll. Dist.*,
480 S.W.2d 289 (Tex. App.—Fort Worth 1972, writ ref'd n.r.e.)....................24

*InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*,
715 S.W.2d 640 (Tex. 1986) .................................................................................18, 19

*Kotz v. Imperial Capital Bank*,
319 S.W.3d 54 (Tex. App.—San Antonio 2010, no pet.) ..................................20

*Lewright v. Bell*,
63 S.W. 623 (Tex. 1901) (orig. proceeding) ...................................................... 31

*Lopez v. Munoz, Hockema, & Reed, L.L.P.*,
22 S.W.3d 857 (Tex. 2000) ....................................................................................27

*Loye v. Travelhost*,
156 S.W.3d 615 (Tex. App.—Dallas 2004, no pet.) ...........................................50

*In re Luther*,
620 S.W.3d 715 (Tex. 2021) (orig. proceeding) ..................................................24

*Mansions in the Forest, L.P. v. Montgomery County*,
365 S.W.3d 314 (Tex. 2012) .................................................................................. 19

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013) ...............................................................................................34

*Miles v. State*,
918 S.W.2d 511 (Tex. Crim. App. 1996) ........................................................ 45

*Millwrights Local Union No. 2484 v. Rust Engineering Co.*,
433 S.W.2d 683 (Tex. 1968) ...............................................................................43-44

iv

*Mitschke v. Borromeo*,
 645 S.W.3d 251 (Tex. 2022)......................................................................23

*Morrison v. Gage*,
 No. 02-15-00026-CV, 2015 WL 4043260 (Tex. App.—Fort Worth
 July 2, 2015, no pet.) ..................................................................................44

*Noe v. Velasco*,
 690 S.W.3d 1 (Tex. 2024) ........................................................................ 21

*Paxton v. Annunciation House, Inc.*,
 No. 24-0573, 2025 WL 1536224 (Tex. May 30, 2025) ......................................30

*Perry v. Del Rio*,
 67 S.W.3d 85 (Tex. 2001) ........................................................................30

*Pierce v. State*,
 184 S.W.3d 303 (Tex. App.—Dallas 2005, no pet.)..........................................44

*Queen Ins. Co. v. State*,
 22 S.W. 1048 (Tex. Civ. App.), *rev'd on other grounds*, 24 S.W. 397
 (Tex. 1893) ..............................................................................................29

*Qwest Commc'ns Corp. v. AT&T Corp.*,
 24 S.W.3d 334 (Tex. 2000) ......................................................................19

*Rubin v. Gilmore*,
 561 S.W.2d 231 (Tex. App.—Houston [1st Dist.] 1977, no writ) ......................25

*Saldano v. State*,
 70 S.W.3d 873 (Tex. Crim. App. 2002)..........................................................30

*San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*,
 291 S.W.2d 697 (Tex. 1956) ....................................................................25

*State of Fla. ex rel. Shevin v. Exxon Corp.*,
 526 F.2d 266 (5th Cir. 1976)......................................................................30

*Shor v. Pelican Oil & Gas Mgmt., LLC*,
 405 S.W.3d 737 (Tex. App.—Houston [1st Dist.] 2013, no pet.)......................44

*Smith v. State*,
 328 S.W.2d 294 (Tex. 1959)......................................................................36

*Sonwalkar v. St. Luke's Sugar Land P'ship*,
 394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.)......................33

*State v. Farmers' Loan & Tr. Co.*,
 17 S.W. 60 (Tex. 1891) ..............................................................................30

*State v. Hollins*,
 620 S.W.3d 400 (Tex. 2020)................................................................ 21, 29

*State v. Naylor*,
    466 S.W.3d 783 (Tex. 2015) ......................................................... 29

*State v. Zurawski*,
    690 S.W.3d 644 (Tex. 2024) ......................................................... 43

*TEA v. Hous. ISD*,
    660 S.W.3d 108 (Tex. 2023) ......................................................... 15

*Tex. Tech Univ. Health Scis. Ctr. v. Rao*,
    105 S.W.3d 763 (Tex. App.—Amarillo 2003, pet. dism'd) ............... 18

*United States v. Olano*,
    507 U.S. 725 (1993) ...................................................................... 26

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ...................................................................... 47

*Univ. of Tex. v. Morris*,
    344 S.W.2d 426 (Tex. 1961) ...............................................2, 41, 47

*Walling v. Metcalfe*,
    863 S.W.2d 56 (Tex. 1993) ................................................ 35, 37, 47

*Webster v. Comm'n for Law. Discipline*,
    704 S.W.3d 478 (Tex. 2024) ................................................... 30, 31

*Wil-Roye Inv. Co. II v. Wash. Mut. Bank, FA*,
    142 S.W.3d 393 (Tex. App.—El Paso 2004, no pet.) ...................... 43

**Contitutional Provision, Statutes, and Rules:**

U.S. Const. amend V. ............................ 1, 11, 15, 37, 38, 39, 40, 42, 44, 45

Tex. Const. art.:
    V, § 21 ......................................................................................... 33
    IV § 22 ........................................................................................ 33

Tex. Alco. Bev. Code § 101.01(a) ...................................................... 33

Tex. Bus. & Com. Code:
    § 17.47(a) .................................................................................... 33
    § 109.006 ..................................................................................... 33

Tex. Civ. Prac. & Rem. Code:
    Ch. 65 ............................................................................... 28, 31, 34
    § 65.011(3) ................................................................................... 31

Tex. Fin. Code § 392.403(d) ............................................................. 33

Tex. Gov't Code
    § 404.094(a) ................................................................................ 35

§442.012(a) ...................................................................................... 33

Tex. Health & Safety Code:

§ 170A.002 ....................................................................10, 20, 38, 48

§ 170A.002(b)(1) ......................................................................23-24

§ 170A.005.............................................................. 10, 28, 31, 36

§ 170A.006 ......................................................................................32

Tex. Occ. Code:

§ 155.001.................................................... 10, 20, 23, 25, 48

§ 165.051.........................................................................................32

§ 165.101 ...............................................................10, 28, 31, 32, 36

§ 165.152(a).................................................................................. 23

§ 165.159 ................................................................................ 10, 20

§ 2001.558(a) ............................................................................... 33

Fed. R. Civ. P. 65(d) ...................................................................... 19

Tex. R. App. P.:

33.1 ................................................................................................ 17

33.1(a)(1)...................................................................................... 17

33.1(d).......................................................................................... 17

39.7 ............................................................................................viii

Tex. R. Civ. P. 683 ............................. ix, 13, 14, 16, 17, 18, 19, 22, 23, 25, 26, 27, 28

Tex. R. Evid.:

513(a) ............................................................................................ 43

513(c) ............................................................................................ 43

803(24) .................................................................................... 45, 46

901(a).............................................................................................44

**Other Authorities:**

George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 354 (1977) ...................................30

W. Holdsworth, *A History of English Law*, Vol. 6 (2d ed. 1971) ..............................30

# Statement Regarding Oral Argument

The State believes the Court can affirm the trial court's grant of a temporary injunction without oral argument but would welcome the opportunity to participate if the Court decides to hold argument. *See* Tex. R. App. P. 39.7.

# Issues Presented

1. Whether (a) Appellants' challenge to the trial court's temporary injunction under Rule 683 fails on appeal because they did not preserve error in the trial court, but (b) even if error preservation is not required, the temporary injunction still complies with Rule 683 and thus should be affirmed.

2. Whether the Attorney General has the authority to enforce the laws alleged to be violated by Appellants by suing in the name of the State and seeking civil penalties and injunctive relief under general equitable principles.

3. Whether some evidence supports the trial court's temporary injunction.

# INTRODUCTION

After the State presented evidence at a temporary-injunction hearing that Maria Rojas had performed or attempted to perform illegal abortions, Rojas invoked the Fifth Amendment over 150 times. She then chose not to present any contrary evidence or call any witnesses. Accordingly, the trial court had ample grounds to enjoin Rojas and her clinics (collectively, Appellants) from unlawfully practicing medicine and performing abortions.

On appeal, Appellants lead with unpreserved procedural objections. Even if considered, these objections fail. For example, their assertion that they do not understand the basis of the order or the acts enjoined—"practicing medicine" and "performing abortions"—makes little sense. Under Texas law, no person, other than a licensed physician, can take those actions. Their argument that the Attorney General cannot, on behalf of the State, seek to enjoin them from performing unlawful abortions is also flawed. The Legislature specifically authorized the Attorney General to seek civil penalties when individuals unlawfully perform abortions or practice medicine. Thus, the Attorney General has causes of action for bringing this suit, and has the authority to request injunctive relief consistent with equitable principles. Appellants' theory would leave the Attorney General powerless to prevent the loss of unborn life, limiting him only to after-the-fact remedies.

Finally, Appellants' counterfactuals to explain the evidence against them simply present an alternative view of the evidence—one that the trial court was free to reject given the State's evidence to the contrary. The evidence permitted the trial court to

draw the necessary inferences and enter a temporary injunction. There was no abuse of discretion. The Court should affirm the temporary injunction.

**STATEMENT OF FACTS**

## I. The State's Investigation

### A. Rojas' clinics and the HHSC complaint

Rojas is a licensed midwife, 2.RR.51-2.RR.52,[1] and is the manager of Maternal and Child Healthcare and Research Center LLC, which operated three clinics: the Waller Clinic, the Telge Clinic, and the Spring Clinic. 2.RR.16-36; Appellants' Br. 5.[2] The Telge Clinic also had a birthing center called the Houston Birth House. 2.RR.37-45. Through Zelle payments, Rojas paid several individuals associated with the clinics. 2.RR.76. Jose Manuel Cendan Ley claimed to work as an unlicensed "medical assistant" at the clinics and was observed at the clinics several times. 2.RR.72-75, 80-82, 84-85. Sabiel Gongora was also observed to work as an unlicensed "medical assistant" at the clinics. 2.RR.78, 80, 82, 84. Ley and Gongora communicated with Rojas through WhatsApp, 2.RR.84, 90-94, but claimed to work with Rubildo Labanino through telemedicine, 2.RR.84-85. Some of the clinics had a license on the wall identifying Labanino as a Family Nurse Practitioner. 2.RR.74, 83.

---

[1] Her midwife license is currently suspended. 1.RR.187.

[2] Appellants ask this Court to take judicial notice of various facts, such as the appropriate dosages of drugs used in medication abortions. *E.g.*, Appellants' Br. 20-21. Appellants' request for judicial notice at this stage is not justified, as review of the trial court's decision to grant the temporary injunction "must be controlled by the record made in the trial court at the time the injunction was issued." *See Univ. of Tex. v. Morris*, 344 S.W.2d 426, 429 (Tex. 1961).

In January 2025, the Texas Health and Human Services Commission (HHSC) received a credible complaint that Rojas' clinics were performing elective abortions. 2.RR.6-12. The complainant identified two women who had obtained elective abortions there and stated: "I personally know that [t]hey still perform abortions for the cost of 900 dollars." 2.RR.12.

Investigators researched ownership of the clinics, surveilled the clinics, and spoke to witnesses throughout February and early March. 2.RR.70-82. On March 6, Rojas and Ley were arrested. 2.RR.82. Additional evidence was seized during arrest and under search warrants for the clinics. 2.RR.82-84.

## B. Evidence of abortions

Lieutenant Edward Wilkerson, a licensed Texas Peace Officer with the Texas Office of Attorney General-Medicaid Fraud Control Unit for approximately six years and, prior to that, a licensed peace officer with Pasadena Police Department for thirty years, was one of the investigators assigned to investigate the complaint against Rojas and her clinics. 2.RR.70-71. Wilkerson had conversations with several other investigators and reviewed offense reports. 2.RR.70-71. He then provided two similar affidavits supporting arrest warrants for Rojas. 2.RR.65-125 (State's Exs. 16 & 17). The State offered his affidavits, along with other documentary evidence, at the temporary-injunction hearing.

### 1. Abortion-inducing drugs and fake identities

During Rojas' arrest, officers seized "a pill bottle containing 29 pills of misoprostol" and $2,900 in cash. 2.RR.82-83. Wilkerson stated that he "knows, based on training and experience, that misoprostol is an abortifacient commonly used to

induce medical abortions, either alone or in combination with mifepristone." 2.RR.83. He further explained that misoprostol causes uterine contractions and cervical dilation, which expels a fetus from the womb. 2.RR.83. While misoprostol is frequently prescribed for legal abortions under medical supervision, it is also "commonly used in illegal abortion procedures performed outside of licensed medical facilities." 2.RR.83.

In addition, an empty bottle of misoprostol was discovered at the Telge Clinic when searched under warrant. 2.RR.83. Wilkerson discovered through the pharmacy that the empty bottle of misoprostol had been ordered over the phone by "Maria" on January 10, 2025, under Labanino's National Practitioner Identifier (NPI). 2.RR.87. The prescription had *patient* information matching Rojas' date of birth and address but with a different name. 2.RR.87.

Wilkerson also discovered that the same patient name had also been used to obtain a prescription for misoprostol on April 17, 2024, but with a different birth date that changed multiple times, at one point matching that of Rojas' husband. 2.RR.87. And the patient phone number matched Rojas' number. 2.RR.87. As Wilkerson explained in his affidavit, he "knows from experience that illicit abortion providers often obtain prescription medications under other individuals' names to avoid detection." 2.RR.83.

### 2. Witness 1

Witness 1 was one of the women identified in the HHSC complaint who allegedly received an abortion from Rojas. Witness 1 also showed Lieutenant Cynthia Vargas "a bank transaction for the procedure, which cleared as Clinica Waller."

4

2.RR.77. Wilkerson noted the presence of Witness 1's name and payment details in a patient logbook seized under warrant. 2.RR.83. Although not considered by the trial court due to a hearsay objection, Vargas interviewed Witness 1 "who confirmed that she received an abortion at the . . . Telge [Clinic] on January 17, 2025, and positively identified Rojas as the person who performed the procedure." 2.RR.77.[3]

### 3. Witness 3

Wilkerson determined based on observation and surveillance that a third woman, Witness 3, may have obtained an illegal abortion from Rojas. Wilkerson's affidavit indicates that, on March 3, 2025, he observed a grey Tahoe arrive at the Waller Clinic. 2.RR.80. A female, who had been driving, entered the clinic with a male, a passenger in the Tahoe. 2.RR.81. Wilkerson observed Rojas arrive a short time later, and he had "reason to believe that [Ley] called or texted Rojas to come in specifically to assist with or perform a procedure." 2.RR.81. Later, Wilkerson "observed the male and female exit the clinic," but "[t]his time, the male was observed escorting the female to the passenger side of their vehicle, leaning into the vehicle, and appearing to assist her in getting seated and buckled in before walking around to the driver's side and driving away." 2.RR.81.

Wilkerson thus believed that "the female had undergone a medical procedure or received medical services that left her in a state requiring assistance." 2.RR.81.

---

[3] The State asserts the statements could have been considered by the trial judge, as explained *infra*, 45-47.

"Based on the totality of the circumstances and [Wilkerson's] training and experience," Wilkerson "believe[d] that the medical services or procedure in question may have involved an abortion, facilitated by Rojas and [Ley]." 2.RR.81.

Again, although not considered by the trial court due to a hearsay objection, Witness 3 confirmed Wilkerson's suspicions. *See* 2.RR.85-87. Witness 3 told investigators that she went to the Waller Clinic "seeking medical advice when she found out she was pregnant." 2.RR.85. On March 1, 2025, she went to the clinic "for a consultation to see how far along she was in her pregnancy and to get an assessment on the status of her pregnancy since it had been described to her as high risk." 2.RR.85. Employees at the clinic "referred to the person she would be consulting with as a gynecologist." 2.RR.85. Her blood was drawn, and she explained the reasons for her visit to the woman identified as the "gynecologist." 2.RR.85.

Two days later, the same female "gynecologist" "gave her the lab results from her previous visit and informed her that she was four (4) weeks pregnant." 2.RR.85. The "gynecologist" further explained that "based on the lab results, she could not continue with the pregnancy" and that the "gynecologist" could provide a treatment ending the life of Witness 3's unborn child. 2.RR.85-86 (stating Witness 3 had a 9% chance of a successful pregnancy). Witness 3 stated that, "as a result of her mistaken belief that the gynecologist was in fact a licensed physician in the State of Texas, she relied on the gynecologist's medical advice and opted for the treatment regimen suggested." 2.RR.86.

The "gynecologist" gave Witness 3 a pill but did not tell her what it was or what side effects to expect, other than bleeding. 2.RR.86. The male employee gave her a

vitamin IV and an iron injection, "and he told her it was part of the treatment due to the amount of the blood she would be losing." 2.RR.86. Witness 3 was released to go home, "and the gynecologist explained to her that within twenty-four hours, she would start to experience vaginal bleeding." 2.RR.86. After experiencing light bleeding, Witness 3 returned to the clinic where the "gynecologist" provided her with additional medication that she identified as misoprostol. 2.RR.86.

Witness 3 stated that she paid $1,320 for the three visits. 2.RR.86-87. In photo lineups, she identified Rojas as the "gynecologist" and Ley as the male that gave her the vitamin infusion and iron injection. 2.RR.87. Witness 3 told the investigators "that had she not been given the option of abortion, she and her husband would have continued with the pregnancy." 2.RR.86.

As with Witness 1, Witness 3's statements are corroborated by other evidence. Wilkerson's review of surveillance footage verified each of the visits of Witness 3 to Rojas' clinic. 2.RR.89. Wilkerson also reviewed records collected pursuant to the search warrant executed at the Waller Clinic and found a lab order, lab report, sign-in sheets, and payment notes consistent with Witness 3's statements. 2.RR.89-90. The WhatsApp exchange between Ley and "Doctora Maria" retrieved from Ley's phone also confirmed the nature of Witness 3's visits to the clinic. 2.RR.90-94.

## C. Operation of the Rojas clinics

Wilkerson further testified in his affidavit that "surveillance has shown that similar circumstances have been observed at other locations with Rojas being the likely primary provider in each instance." 2.RR.82. Based on his observations, "it appears

7

Rojas is summoned to perform procedures rather than being on-site full-time, suggesting an operational method where on-duty employees such as [Ley], Labanino, Gongora, and possibly others, contact her via phone or text when an abortion is indicated." 2.RR.82.

1. Surveillance of the clinics and seizure of records revealed Labanino's nurse-practitioner licensure information. 2.RR.74. Wilkerson documented "reason to believe that Labanino is being compensated for the use of his medical credentials rather than actively working at the clinic." 2.RR.78. "[F]inancial transactions, including Zelle payments, suggest he is being paid unofficially." 2.RR.78. Investigators discovered various types of medical licenses for Labanino in Texas, Colorado, New Mexico, Tennessee, Kentucky, and Louisiana, and that he is associated with numerous medical businesses. 2.RR.74. In connection with one of these businesses, Wilkerson learned of an agreed order documenting disciplinary action against Labanino for negligent treatment of a patient. 2.RR.77.

2. Upon arrest, Ley waived his right against self-incrimination and spoke with investigators. 2.RR.84. Ley stated that he was a doctor in Cuba. 2.RR.84. He stated that he acts as a medical assistant at Rojas' clinics, with duties including "triaging patients" and "communicating with an individual he believes to be [Labanino] through a tablet at the clinic regarding the patient's treatment for telehealth." 2.RR.84. He stated that "Labanino authorized him to sign [Labanino's] name on his behalf" and provide patients with pre-printed forms. 2.RR.84. According to the report, Ley admitted that "[t]he Hispanic community perceives him as a doctor and the clinic's business model [is] in a way structured around that community believing

8

he is a physician." 2.RR.84. Ley also admitted that he is not licensed to practice medicine in Texas. 2.RR.84. "He admitted to providing services for a man who had a leg injury, by giving him a tablet (analgesic) and ordering an x-ray," consistent with earlier surveillance observations. 2.RR.84; 2.RR.73. Ley "is aware that Rojas is a midwife, not a licensed physician in the State of Texas, but everyone calls her 'Dr. Maria.'" 2.RR.85.

Investigators reviewed WhatsApp messages on Ley's phone, revealing that Rojas is saved as "Doctora Maria" in WhatsApp and that Ley repeatedly refers to her as "doctor" in their communications. 2.RR.90-93. While working at the clinic, Ley would communicate with Rojas via WhatsApp, updating her as to "patients" he had seen at the clinic. 2.RR.90-93.

3.  Investigators also discovered that Gongora, who was working at the Telge Clinic on March 6, 2025, communicated with Rojas through voice calls on WhatsApp, and also had two applications installed on his phone that are "used by medical professionals for clinical decision support, including drug interactions, medical guidelines, and disease diagnosis tools." 2.RR.84. As Wilkerson testified in his affidavit, "[t]he presence of these apps on Gongoro's device is consistent with someone engaged in medical decision-making, despite Gongoro lacking any known medical license in Texas." 2.RR.84.

4.  Wilkerson's affidavit also testified about suspect behavior concerning Rojas' license and use of physician's names. The affidavit explained that, when her attempt to renew a facility license for the Telge Clinic's Houston Birth House with an expired midwife license was rejected, Rojas removed her name from the application

9

but left a Dr. Rafael De Ayala's name on the application. 2.RR.75-76. "Dr. De Ayala, who was notified of the renewal, notified HHSC that he 'never had any relationship with any free-standing birthing center and specifically not one associated with Maria Rojas, including a Houston Birth House.'" 2.RR.76.

5.     The State preserved printouts of websites related to Rojas' clinics that were admitted as evidence at the temporary-injunction hearing. 2.RR.24-50, 53-64. The websites advertised services, including "Doctor Examination," 2.RR.59, and "PROCEDURES AND MINOR SURGERY,"2.RR.63. Rojas' biography on the Houston Birth House website highlights her "huge medical background" and that "she started studying medicine at the young age of 16 with a passion for woman's health and Obstetrics ever since." 2.RR.49.

## II.  The State's Lawsuit

The Texas Human Life Protection Act prohibits all abortions except for those performed by a licensed physician in a medical emergency. Tex. Health & Safety Code § 170A.002. It authorizes the Attorney General to seek civil penalties of at least $100,000 per violation of the Act. *Id.* § 170A.005. The Medical Practice Act also prohibits anyone who is not a licensed physician from practicing medicine. Tex. Occ. Code §§ 155.001, 165.159. The Attorney General may also seek civil penalties for such violations. *Id.* § 165.101.

Based on the evidence that Rojas was performing unlawful abortions and practicing medicine without a license, the Attorney General, on behalf of the State, sued for civil penalties and injunctive relief against Rojas and her clinics. CR.33-75. The

10

trial court granted the State's request for a temporary restraining order and then held a hearing on the State's request for a temporary injunction on March 27. CR.31-32.

At the hearing, the State offered, and the trial court admitted, evidence of Rojas' control of the clinic entities, 2.RR.14-23; printouts of the clinic websites, 2.RR.24-50, 53-64; information about Rojas' midwife license, 2.RR.52; and the arrest warrants and probable cause affidavits for Rojas, 2.RR.65-125. The State also called Rojas to the stand for questioning. Rojas did not answer any questions, repeatedly invoking her Fifth Amendment right not to incriminate herself. 1.RR.60-94, 147-160.

Under oath, Rojas invoked her Fifth Amendment right not to answer questions such as whether:

- she performed an abortion at Clinica Latinoamericana-Telge on January 17th, 2025, 1.RR.76;
- she performed an abortion in March at Clinica Waller, 1.RR.86;
- she has administered misoprostol to women to end pregnancies after passage of the Human Life Protection Act, 1.RR.64;
- she has been accepting cash payments in exchange for performing abortions for years since at least 2021, 1.RR.67-68;
- she has obtained misoprostol through fake identities, 1.RR.70;
- she employs people at her clinics who provide medical services without licenses, 1.RR.63;
- she requires her employees to call her "Dr. Maria," 1.RR.73;
- she holds herself out to the public as a gynecologist, 1.RR.73;

- she authorizes her employees to perform medical services at her clinics when they are alone, unsupervised, and have no medical license, 1.RR.75;

- her clinics' business model is structured around the community believing that she and Ley are physicians, 1.RR.84-85;

- she told a patient that her baby would likely not survive, without consulting a licensed physician or informing the patient that she was not a physician, 1.RR.89-90; and

- no one working at the clinics is a physician licensed to perform doctor's examinations or procedures and minor surgery, two services advertised for bookings through the Clinicas Latinoamericas services web page, 1.RR.156-57.

Appellants did not call any witnesses or present any evidence at the hearing, although the trial court offered to give Rojas and the clinics additional time to prepare. 1.RR.14. After the State put on its evidence and questioned Rojas, Appellants rested. 1.RR.161. At the end of the hearing, the trial court offered again to allow Appellants to bring in witnesses, but Appellants did not do so. 1.RR.200.

The trial court made several evidentiary rulings during the hearing. The judge denied admission of the HHSC complaint as not authenticated as a public record. 1.RR.18-24. But the judge admitted the arrest warrants and Wilkerson's affidavits over Appellants' objections that the affidavits were not authenticated, were hearsay, and could not be used to support a temporary injunction. 1.RR.114-117. The trial judge, however, stated that he was "not going to consider" statements by witnesses

(or "alleged victims") to investigators. 1.RR.140. The affidavits' report about statements of Ley to investigators, however, was admitted as an opposing party's statement and a statement against interest. 1.RR.134, 1.RR.138.

Appellants had a copy of the draft temporary-injunction order by the morning of the hearing and did not object or complain about alleged deficiencies under Texas Rule of Civil Procedure 683 when the judge indicated at the hearing he would be entering the order. 1.RR.199-202. After the hearing, the trial court issued the order granting the State's application for a temporary injunction. CR.12-14. As explained in the order, Rojas and her clinics were enjoined from "practicing medicine or performing abortions in violation of State law." CR.13.

## Summary of the Argument

**I.** Appellants did not preserve error as to compliance with Rule 683, and, in any event the order complies with the Rule except perhaps setting for trial.

Absent an objection to the trial court, Appellants cannot show error on appeal based on Rule 683. Although most courts of appeals have determined that a challenge under Rule 683 need not be preserved in the trial court to be presented on appeal, this Court should join the Third and Seventh Courts of Appeals in following the general rules of error preservation announced by the Supreme Court for non-jurisdictional matters. In addition, Appellants invited error as to setting trial and should be estopped from challenging the order on that basis on appeal, having also waived the argument.

13

The court's order also complies with the other requirements of Rule 683 because it explains the reasons for its issuance, gives reasonable notice to the restrained parties of the acts the court enjoins, and involves the public interest.

**II.** Appellants' assertion that the Attorney General has no standing to sue for an injunction for a violation of the Human Life Protection Act or the Medical Practice Act, or to sue in the name of the State, has no merit.

Appellants do not dispute that the statutes at issue in this case provide causes of action for the Attorney General to sue for civil penalties for their violation. A statute providing a cause of action for a civil penalty also authorizes seeking an injunctive remedy under equitable principles and the Civil Practice and Remedies Code. The cases cited by Appellants are distinguishable because they relate to situations in which the Attorney General lacked a statutory basis for suing at all.

Appellants also fail to support their argument that the Attorney General may not sue in the name of the State. Because the Legislature has provided the causes of action under which this suit was brought, and has authorized the Attorney General to prosecute such causes of action, the Attorney General may properly sue in the name of the State.

**III.** Before the trial court, the State proved (1) a cause of action against Appellants; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

Here, the State presented evidence that it seized from Rojas' clinics abortion-inducing drugs obtained through fake identities and observed that Witness 3 likely obtained an abortion from Rojas. Adverse inferences from Rojas' invocation of the

14

Fifth Amendment in the face of this evidence further support the trial court's decision that the State was likely to succeed on its claims that Appellants performed or attempted to perform abortions. In addition, the trial court incorrectly concluded that it could not consider statements to investigators by Witness 1 and Witness 3, and the injunction order can also be affirmed on the basis of that evidence.

The evidence presented to the trial court also amply supports the decision that the State is likely to succeed in showing Appellants practiced medicine in violation of State law, even apart from showings specific to abortion. The trial court was presented with evidence that Rojas holds herself out as a doctor, despite not being a licensed physician in the United States. Appellants' websites also advertised services that unlicensed individuals could not perform, and the evidence undermines Appellants' claims that the practice of medicine may have been in accordance with the law governing licensing of nurses. The Court should affirm the trial court's order.

## Standard of Review

The Court reviews an order granting a temporary injunction for an abuse of discretion. *TEA v. Hous. ISD*, 660 S.W.3d 108, 116 (Tex. 2023). Under this standard, the Court defers to the trial court's factual findings if they are supported by the evidence but reviews legal determinations de novo. *Haedge v. Cent. Tex. Cattlemen's Ass'n*, 603 S.W.3d 824, 827 (Tex. 2020).

# ARGUMENT

## I. Appellants' Rule 683 Arguments Do Not Warrant Reversal of the Temporary Injunction.

Appellants begin with a series of attacks on the temporary injunction based on the order's alleged failure to comply with Texas Rule of Civil Procedure 683. The Court should reject their arguments for two reasons.

*First*, Appellants argue that the temporary-injunction order does not explain the reasons for its issuance and does not adequately specify the conduct prohibited. Appellants' Br. 33-36. Appellants have not preserved error as to the requirements of Rule 683. Appellants had a copy of the draft order by the morning of the hearing and did not object to its form or complain about any alleged deficiency under Rule 683 when the trial judge indicated at the hearing he would be entering the order, and did not complain to the trial court afterward. 1.RR.199-202. To allow Appellants to refrain from objecting under Rule 683, only to attack the order on this basis on appeal, would invite gamesmanship and waste—and violate rules of preservation.

*Second*, the temporary injunction nonetheless complies with Rule 683. *See* CR.12-14. It sets forth the reasons for its issuance and sufficiently describes the acts enjoined. And as for the failure to include a trial date, Appellants invited that error themselves by insisting to the trial court that setting a date for trial was not required in the injunction order and agreeing to work with the court coordinator to later set a date. 1.RR.201. Thus, Appellants have not preserved the issue for appeal, have waived or forfeited the argument, and should also be estopped from making a contrary argument on appeal.

At the end of the day, this injunction involves the public interest, and "[w]here the public's interest is involved, the requirements of Rule 683 are relaxed." *Breithaupt v. Navarro County*, 675 S.W.2d 335, 339 (Tex. App.—Waco 1984, writ ref'd n.r.e.). Therefore, "[a]ny doubt concerning compliance with Rule 683 should be decided against the violator and in favor of the public." *Id.*

## A. Appellants forfeited their objections to the temporary injunction.

Appellants' arguments fail from the outset because they did not object or complain to the trial court regarding compliance of the order with Rule 683. Accordingly, Appellants have not preserved error regarding compliance with Rule 683, as distinguished from the sufficiency of evidence to support the order. *See* Tex. R. App. P. 33.1(d) (distinguishing between "a complaint regarding the legal or factual insufficiency of the evidence" and "a complaint that the trial court erred in refusing to amend a fact finding or to make an additional finding of fact" in a civil non-jury trial).

Texas Rule of Appellate Procedure 33.1(a)(1) requires, "[a]s a prerequisite to presenting a complaint for appellate review," that a party complain "to the trial court by a timely request, objection, or motion." Without such a complaint, the additional requirements of Rule 33.1 necessarily are not met. Despite having a copy of the proposed temporary-injunction order on the morning of the hearing, and despite the trial court's indication at the hearing that it would enter the order, 1.RR.199-200, Appellants never complained about any alleged deficiency under Rule 683. Appellants have yet to complain to the trial court about compliance with Rule 683 or to request any additional findings, hoping instead to defeat the order on appeal on this basis.

Whether a party must object to preserve Rule 683 arguments has split the courts of appeals. Most have held that "a party need not preserve error on a complaint that a temporary-injunction order does not comply with Rule 683." *Hoist Liftruck Mfg., Inc. v. Carruth-Doggett, Inc.*, 485 S.W.3d 120, 124 (Tex. App.—Houston [14th Dist.], no pet.) (Frost, C.J., concurring) (collecting cases). But the Third and Seventh Courts have held that a party must preserve error in the trial court to raise a Rule 683 defect on appeal. *See id.* at 124-25 & nn. 23-24 (citing *Emerson v. Fires Out, Inc.*, 735 S.W.2d 492, 493 (Tex. App.—Austin 1987, no writ); *Tex. Tech Univ. Health Scis. Ctr. v. Rao*, 105 S.W.3d 763, 768 (Tex. App.—Amarillo 2003, pet. dism'd)). "[T]hough representing the minority view," the Third and Seventh Courts "hold the sounder position." *Id.* at 124-25. As then-Chief Justice Frost of the Fourteenth Court explained, "[t]he courts of appeals that apply the no-preservation rule have not explained why they believe [*InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640 (Tex. 1986),]) (per curiam)] mandates the conclusion that parties need not preserve error in the trial court." *Id.* at 126. "By contrast, the courts of appeals that have reached the opposite conclusion have given sound reasons for requiring error preservation." *Id.*

Concluding that Rule 683 objections must be preserved, the Third Court has explained:

> It serves no good purpose to permit appellants to lie in wait and present this error in form for the first time on appeal. On proper request, the district court could easily have added to the judgment a description of the specific harm avoided by granting the temporary injunction. Appellants would then have obtained proper notice of the district court's reasoning and appellate review would have been facilitated.

18

*Emerson*, 735 S.W.2d at 494.

Further, as Chief Justice Frost explained in her *Hoist Liftruck* concurrence, the two Texas Supreme Court cases on which the majority of courts of appeals rely did not address the issue of error preservation. 485 S.W.3d at 125 (referring to *InterFirst* and *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam)). In addition, "Rule 683 is based on Rule 65(d) of the Federal Rules of Civil Procedure," and "[t]he majority view among the federal courts appears to be that noncompliance with Rule 65(d)'s requirements as to form does not render an injunction void." *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 384 n.1 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (Goodman, J., concurring) (collecting cases).

This Court should join the Third and Seventh Courts in following the general rules of error preservation announced by the Supreme Court for non-jurisdictional matters. *See, e.g.*, *Mansions in the Forest, L.P. v. Montgomery County*, 365 S.W.3d 314, 317 (Tex. 2012) (per curiam). Under those rules, Appellants have not preserved error for any alleged deficiency under Rule 683, and those untimely arguments should be rejected as forfeited.

## B. The order sets forth its reasons for issuance.

Even if Appellants' Rule 683 arguments are considered, they do not demonstrate error. Appellants contend that the temporary-injunction order does not explain the reasons for its issuance. Appellants' Br. 33-34. The order, however, references the Court's consideration of "the application, the evidence, and argument of counsel," finds that the State "is likely to succeed in this action," and finds "that a

19

Temporary Injunction is in the public interest and should be issued to restrain and prevent violations of the Texas Health and Safety Code sections 170A.002 and 171.003 and the Texas Occupations Code §§ 155.001 and 165.159." CR.12-13. The order further determines that "[t]he State of Texas has a sovereign interest in the enforcement of its own laws, any injury to which is irreparable, and the termination of unborn life is also necessarily irreparable." CR.13.

Anyone reading the order would understand that the trial court believed that Appellants were unlawfully practicing medicine and performing abortions, harming the sovereign interests of the State and ending unborn children's lives. And Appellants' arguments regarding the sufficiency of the evidence to support the order demonstrate that they understand the trial court's reasons, too. In the context of this case brought by the Attorney General in the name of the State for violations of specific laws prohibiting abortion, the reasons given in the order are sufficient.

Appellants' cases are not to the contrary.

**1.** In *Kotz v. Imperial Capital Bank*, the Fourth Court determined that an injunction order did not detail why irreparable injury would occur if a party were not enjoined from taking possession of commercial real estate. 319 S.W.3d 54, 55-56 (Tex. App.—San Antonio 2010, no pet.). In contrast to *Kotz*, two obvious injuries are explicitly listed in the trial court's order: the State's interest in enforcing its own laws and the loss of unborn life. CR.13.

*First*, this case involves the State's sovereign interest in enforcement of its own laws, specifically the Human Life Protection Act and the Medical Practice Act. The Texas Supreme Court has "reiterated that '[a]s a sovereign entity, the State has an

intrinsic right to . . . enforce its own laws.'" *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam). "The sovereign would be impotent to 'enforce its own laws' if it could not temporarily enjoin those breaking them pending trial." *Id.* at 411. Thus, the trial court properly determined that "[t]he State of Texas has a sovereign interest in the enforcement of its own laws, any injury to which is irreparable." CR.13.

*Second*, this case also was brought to prevent the unlawful performance of abortions. It cannot be disputed, as the trial court stated, that "the termination of unborn life is also necessarily irreparable." *Id.; see also Noe v. Velasco*, 690 S.W.3d 1, 7 (Tex. 2024) (explaining that Texas has a "'strong public policy of preserving and protecting life' and the foundational recognition of 'the dignity, sanctity, and profound value of life.'"). Appellants do not challenge the sufficiency of this determination but argue only that "the order does not find—much less support the finding with any reasons—that it is probable and imminent that state law will be violated or unborn life will be terminated without an injunction." Appellants' Br. 34. But that is a challenge to the sufficiency of the evidence. As explained below, based on the totality of evidence presented at the hearing, the trial court properly found that the State is likely to succeed in this action. *See infra* 37-50.

**2.** In *Good Shepherd*, the injunction order stated that the plaintiff "ha[d] shown a probable right to relief at trial" because the defendant "ha[d] threatened to discontinue certain healthcare-related services," which it stated would cause the plaintiff's patients to suffer irreparable injury. *Good Shepherd Hosp., Inc. v. Select Specialty Hosp. - Longview, Inc.*, 563 S.W.3d 923, 927 (Tex. App.—Texarkana 2018, no

pet.). But the appeals court noted evidence that "the lease agreement did not require [the defendant] to provide any services" and that the defendant had assured the plaintiff that it would "not allow patient care to be compromised." *Id.* at 926 nn.2& 3. Thus, in the context of that case, it was not clear why the trial court considered there to be a likely breach of the contract or irreparable injury, and the injunction order's statement "did not constitute a legally sufficient and specific finding that [the plaintiff] had a likelihood of success of proving the elements of either the breach of contract or anticipatory breach of contract claim." *Id.* at 929; *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) ("[G]enerally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available.").

Here, the State has alleged violations of specific laws by Rojas and her clinics, and the trial court found the State was likely to succeed based on the evidence presented, reasonably informing Appellants why they were being enjoined from violating these laws. That makes this case more like the *Breithaupt* case cited elsewhere by Appellants, where the Tenth Court determined that the trial court's finding that a road was a public thoroughfare "reasonably inform[ed] [the defendants] why they were being enjoined from obstructing it." *Breithaupt*, 675 S.W.2d at 340. There, as here, a more detailed explanation of the reasons for issuance was not required in the order for it to comply with Rule 683. This is particularly so where the public interest is involved, as in this case. *Id.* at 339 (noting the relaxed requirements of Rule 683 when the public's interest is involved).

Compliance with Rule 683 ensures that the enjoined party understands why he is being enjoined, properly framing the issues for trial and appeal. Appellants here well understand why they are enjoined, even if they disagree that the evidence supports the injunction. As the Texas Supreme Court has noted, "Texas law greatly favors resolving litigation on the merits rather than on procedural technicalities." *Mitschke v. Borromeo*, 645 S.W.3d 251, 260 (Tex. 2022). Although the trial court could have said more, it said enough, and the Court should reject this ground for reversal.

## C. The trial court's temporary-injunction order is specific and describes in reasonable detail the acts restrained.

Appellants next assert that the injunction fails to comply with Rule 683 because it does not adequately specify the conduct prohibited. Appellants' Br. 34-36. The trial court's injunction order specifically enjoins Rojas and her agents from two acts: (1) "practicing medicine" and (2) "performing abortions in violation of State law." CR.13. Appellants fail to explain why they find this language unclear.

As for "practicing medicine," Texas law is explicit that "[a] person may not practice medicine in this state unless the person holds a license issued under this subtitle" pertaining to physicians. Tex. Occ. Code § 155.001. Thus, every person in Texas is expected to understand that they may not practice medicine unless they are a physician; indeed, it is a crime for a non-physician to practice medicine. *Id.* § 165.152(a). And as for "performing abortions," given that abortions in Texas may be performed only by licensed physicians, Tex. Health & Safety Code

§ 170A.002(b)(1), and no Appellant is a licensed physician, no Appellant may perform an abortion. Appellants do not explain why they needed the trial court to add further detail, especially when it cited the very statutes that prohibit the conduct enjoined. CR.13.

That makes this case different than *In re Luther*, on which Appellants rely and which did not specify the laws the individual was enjoined from violating. 620 S.W.3d 715, 722 (Tex. 2021) (orig. proceeding) (per curiam). Appellants' other citation, *Cooper Valves, LLC v. ValvTechnologies, Inc.*, is likewise unhelpful. 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.). There, the court noted that an injunction "should not be so broad that it prohibits the restrained party from engaging in *lawful* activities that are a proper exercise of its rights." *Id.* at 266 (emphasis added). But it is not "lawful" for Appellants to practice medicine or perform abortions, so there is no threat of prohibiting permissible conduct.

Appellants contend that "[t]he injunction is no more specific than an order that says: 'Don't violate state law.'" Appellants' Br. 36. But the order specifically lists the actions prohibited (practicing medicine or performing abortions) and the statutes on which the injunction is based. CR.13. Reference to the law in this circumstance is explanatory. *See Hughes v. Bd. of Trs., Tarrant Cnty. Jr. Coll. Dist.*, 480 S.W.2d 289, 294 (Tex. App.—Fort Worth 1972, writ ref'd n.r.e.) (per curiam). There is, accordingly, no basis for Appellants' complaint that they must scour all of Texas law to determine what is prohibited. Appellants' Br. 36. After all, the trial court included the statutory cites for them. CR.13.

Appellants also complain that "the order requires restrained parties to make inferences and conclusions about what it means to 'practice medicine.'" Appellants' Br. 36. Again, all persons in Texas are commanded not to practice medicine without a license. Tex. Occ. Code § 155.001. Appellants do not challenge Texas law as unconstitutionally vague and offer no reason why they are unable to understand and comply with it.

Further, in cases involving the public interest, "an injunction decree need not specifically enumerate every possible act which might constitute an unauthorized practice." *Rubin v. Gilmore*, 561 S.W.2d 231, 235 (Tex. App.—Houston [1st Dist.] 1977, no writ). Unauthorized-practice-of-law cases provide an example. There, "the court cannot attempt to spell out for the future how [defendants] may or may not escape the terms of the order by varying this or that part of a whole system of long standing" that resulted in the unlicensed practice of law. *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 702 (Tex. 1956). In such cases, it is not necessary "that the decree specify the numerous acts constituting the practice of law from which the defendant is prohibited from doing." *Davies v. Unauthorized Prac. Comm.of the State Bar of Tex.*, 431 S.W.2d 590, 594 (Tex. App.—Tyler 1968, writ ref'd n.r.e.). The same rationale holds here.

The trial court's order need not "list every act which could conceivably be committed" because doing so "would extend the requirements of Rule 683 to illogical limits." *Breithaupt*, 675 S.W.2d at 340. Moreover, "[w]hen the public is involved, the public interest, not the requirement of private litigation, measures the need for injunctive relief," and any "doubt [in the decree's framing] should be resolved in

favor of the public and against the violator." *Davies*, 431 S.W.2d at 595. Here, because the court's order gives reasonable notice to Appellants of the acts the court enjoins, it is sufficiently specific and should be upheld.

## D. Appellants' invited error regarding the exclusion of a trial date does not provide a reason to reverse.

Appellants' final Rule 683 argument is that the injunction fails to set the case for trial. Appellants' Br. 37-38. As observed above, Appellants have not preserved error as to compliance with Rule 683, and have entirely forfeited that argument by not timely asserting it before the trial court. In addition, Appellants waived the argument because Appellants intentionally relinquished this known right when the State clarified Rule 683's requirements at the hearing. 1.RR.201-02; *see Bertucci v. Watkins*, 709 S.W.3d 534, 541 n.5 (Tex. 2025); *United States v. Olano*, 507 U.S. 725, 733, (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (internal quotation marks omitted)). The policy considerations that support the preservation-of-error requirement apply with additional force in this case, because Appellants invited that alleged error. "The invited-error doctrine, like estoppel, may operate when a party has taken some previous action or position that is inconsistent with its current position." *In re G.X.H.*, 627 S.W.3d 288, 301 (Tex. 2021) (citing *In re DFPS*, 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding) (explaining that the invited-error doctrine applies when "a party requests the court to make a specific ruling, then complains of that ruling on appeal")).

26

In addition to waiver, forfeiture, and invited error, Appellants should also be estopped from challenging the order on that basis on appeal. "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema, & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.*

At the end of the temporary-injunction hearing, counsel for the State informed the trial court that "Rule 683 requires that [the injunction order] includes an order setting the cause for trial." 1.RR.201. Counsel for Appellants then contradicted her, asserting "[n]ot in the injunction order, Your Honor." 1.RR.201. Counsel for the State then made a record that the parties agreed that they would come up with a scheduling order, and counsel for Appellants confirmed that they would present an "agreed . . . order for the Court, getting a trial date." 1.RR.202. Apparently accepting that agreement, the trial court noted on the injunction that the parties would arrange a trial date with the court coordinator. CR.14.

Appellants now seek to take advantage of their misstatement of the law, which led the trial court to issue the allegedly deficient injunction. Having introduced the error, agreed on the record to set a trial date, and failed to object to the injunction's lack of a trial date, Appellants are not entitled to relief. Regardless, because the injunction includes the process for setting the trial date with the court coordinator, even if it does not have the specific date, it should suffice for purposes of Rule 683. It would be a waste of judicial resources to repeat this appellate process with the only

change being the entry of a specific date on the temporary-injunction order. The Court should therefore reject all of Appellants' Rule 683 arguments.

## II. The Attorney General Has the Authority to Enforce the Laws Appellants Allegedly Violated.

Appellants next challenge the Attorney General's authority to bring this suit. Appellants assert that "[t]he Attorney General has no standing to sue for an injunction for a violation or threatened violation of the abortion ban or the Medical Practice Act, nor does he have standing to sue in the name of the State." Appellants' Br. 38. But Appellants' arguments do not accurately reflect Texas law or the Attorney General's role.

### A. The Attorney General may seek civil penalties and injunctive relief.

Despite the cases and statutes cited by Appellants, none stands for the proposition that the Attorney General lacks authority to protect unborn life by seeking to enjoin violations of the Human Life Protection Act and the Medical Practice Act. Appellants do not dispute that the statutes at issue in this case provide causes of action for the Attorney General to sue for civil penalties. *See* Tex. Health & Safety Code § 170A.005; Tex. Occ. Code § 165.101. But Appellants argue that the *remedies* available are limited to those expressly included in the statute—penalties—suggesting that chapter 65 of the Texas Civil Practice and Remedies Code, which is available to all other litigants, is not available to the Attorney General. Appellants are wrong.

Further, Appellants did not raise this argument below. They couch it now in terms of "standing" to take advantage of the rule that jurisdictional issues may be

28

raised for the first time on appeal. *See Commons of Lake Hous., Ltd. v. City of Houston*, 711 S.W.3d 666, 686 n.53 (Tex. 2025). But Appellants complain only about the scope of the remedy, not standing to bring this lawsuit—which was expressly conveyed by statute. The Court should treat this argument as forfeited, but if the Court disagrees, it should reject it on the merits.

**1.    The Attorney General has the authority to enforce state law.**

As noted above, the Supreme Court has recognized that "the State has an intrinsic right to . . . enforce its own laws," *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015), including by preventing parties from violating them. Indeed, the "sovereign would be impotent to 'enforce its own laws' if it could not temporarily enjoin those breaking them pending trial." *Hollins*, 620 S.W.3d at 410. And in Texas, enforcement often falls to the Attorney General, the "chief law officer of the State." *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943). It is "the duty of the attorney general to institute necessary proceedings in the courts to enforce or protect any right of the public that is violated, or to redress or prevent any injury done to the public that demands the intervention of the courts." *Queen Ins. Co. v. State*, 22 S.W. 1048, 1052 (Tex. Civ. App.), *rev'd on other grounds*, 24 S.W. 397 (Tex. 1893). "[W]here the public are injured[,] the state must sue to redress the wrong by her attorney general, whether there be a statute to that effect or not." *Id.* The public's interest is certainly implicated here—where Rojas has allegedly aborted unborn children who are protected by Texas law and the Legislature has explicitly tasked the Attorney General (along with others) with enforcing the law.

Allowing the Attorney General to enforce the law is nothing new. For over a century, "it has been steadily held that an action or suit can be maintained by an attorney general in [sic] behalf of the state for the redress of an injury to the public, or to prevent this." *State v. Farmers' Loan & Tr. Co.*, 17 S.W. 60, 65 (Tex. 1891). More recently, the Supreme Court has recognized that, under the Texas Constitution, one of the Attorney General's primary duties is "to represent the State in civil litigation." *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 494 (Tex. 2024) (quoting *Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001)).

The obligation to represent the sovereign is long standing. "The office of attorney general is older than the United States and older than" the State of Texas. *State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268 & n.4 (5th Cir. 1976); *Saldano v. State*, 70 S.W.3d 873, 878-79 (Tex. Crim. App. 2002). With its roots in the "earliest period of English legal history," by the sixteenth century, the Attorney General could be considered "the chief representative of the [sovereign] in the courts." *Shevin*, 526 F.2d at 268 n.4 (quoting 6 W. Holdsworth, *A History of English Law* 457-61 (2d ed. 1971)). Thus, for well over a century, the Attorney General has been representing the State of Texas in its district courts in civil matters. *See* George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 354 (1977).

Part of the Attorney General's "core authority" is to "exercise constitutionally conferred discretion in filing pleadings on behalf of the State." *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *11 (Tex. May 30, 2025). "That judgment and discretion includes not only bringing and defending lawsuits but

30

also . . . the 'right to investigate the facts and [to] exercise his judgment and discretion regarding' the suits in which the State is an interested party." *Webster*, 704 S.W.3d at 495 (quoting *Agey*, 172 S.W.2d at 974). The Attorney General's decision to file suit depends on his "examin[ation] into the facts of the alleged offense, and [his] find[ing] not only that there is reasonable ground to believe that the statute has been violated, but also that the evidence necessary to a successful prosecution of the suit can be procured," *Lewright v. Bell*, 63 S.W. 623, 624 (Tex. 1901) (orig. proceeding). That is what he has done here.

### 2. The Attorney General permissibly sought injunctive relief.

**a.** Here, the Legislature made explicit the Attorney General's authority to seek civil penalties for violations of the law. Tex. Health & Safety Code § 170A.005; Tex. Occ. Code § 165.101. This falls well within his authority to protect the public—including unborn children—through lawsuits. Once the Attorney General files suit under these statutes, he is treated no differently than any other party: the full scope of equitable remedies—such as injunctions—are available to him, just as they are available to all others.

Section 65.011(3) of the Civil Practice and Remedies Code provides that "[a] writ of injunction may be granted if . . . the applicant is entitled to a writ of injunction under the principles of equity and the statutes of this state relating to injunctions." And as demonstrated below, *see infra* 37-51, equitable principles entitled the Attorney General to relief. *See Butnaru*, 84 S.W.3d at 204. No statute places a textual limit on the Attorney General's authority to invoke chapter 65 and the equitable principles

31

permitting injunctive relief. And Appellants cite no precedent suggesting that, despite statutes providing causes of action under which this case was brought, the Attorney General is precluded from relying on these equitable principles to obtain a temporary injunction to prevent violations of state law and protect unborn life. Instead, as explained above, statutes and precedent support the Attorney General's actions here to enforce state law.

In this case, there is also additional statutory support for the injunction remedy. Section 170A.006 of the Texas Health and Safety Code expressly provides that civil remedies are unaffected: "The fact that conduct is subject to a civil or criminal penalty under this chapter does not abolish or impair any remedy for the conduct that is available in a civil suit." Thus, any argument that the civil penalty the Attorney General may recover has an effect on other remedies available is expressly foreclosed by statute. Appellants suggest that section 170A.006 applies only to damages in a tort lawsuit, but they fail to provide any reasoning or authority for adding that nontextual limitation to the statute. Appellants' Br. 42.

Appellants' assertion, *see* Appellants' Br. 42, that the Legislature gave *sole* authority to the Texas Medical Board to seek injunctive relief is not supported by statute. *See* Tex. Occ. Code § 165.051. Granting the Board authority does not remove authority from the Attorney General. Instead, section 165.101 of the Texas Occupations Code authorizes the Attorney General to institute an action for a civil penalty if it appears that a person "is threatening to violate" Subtitle B, which implies that injunctive relief is also available to prevent an actual violation.

**b.** The statutes Appellants cite give the Attorney General the standalone authority to seek an injunction; under them, he need not rely on chapter 65 of the Texas Civil Practice and Remedies Code, equitable principles, or any other cause of action to get into court but can file a suit and seek an injunction under those laws alone. *E.g.*, Tex. Alco. Bev. Code § 101.01(a); Tex. Bus. & Com. Code § 17.47(a); Tex. Fin. Code § 392.403(d); *see also Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186, 199 (Tex. 2012, no pet.) (citing examples involving violation of statutes and explaining that "[i]n other cases in which appellate courts have held that a statute supersedes the common law's injunctive irreparable injury requirements, the statute has specifically defined the type of injury that must be shown to entitle the applicant to injunctive relief").

The Legislature also may "empower[] the Attorney General to likewise represent the State in district court." *El Paso Elec. Co. v. Texas Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996). Thus, these statutes also clarify that the Attorney General may represent the State in such lawsuits. *See* Tex. Const. art. IV § 22 (allowing the Legislature to give the Attorney General "other duties"); *id.* art. V, § 21 (giving district and county attorneys the authority to represent the State). Similarly, the Legislature may choose to give the Attorney General the authority to seek civil penalties, an injunction, or both. *E.g.*, Tex. Bus. & Com. Code § 109.006; Tex. Gov't Code § 442.012(a); Tex. Occ. Code § 2001.558(a). Such a regime is consistent with allowing the Attorney General to seek temporary-injunctive relief once he is properly in court on legislatively approved grounds.

As the Texas Supreme Court has observed, "[t]he force of any negative implication . . . depends on context. . . . [T]he *expressio unius* canon does not apply unless it is fair to suppose that [the legislature] considered the unnamed possibility and meant to say no to it." *Forest Oil Corp. v. El Rucio Land & Cattle Co., Inc.*, 518 S.W.3d 422, 429 (Tex. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). There is no reason to suppose the Legislature intended to limit the Attorney General's authority to seek relief under generally applicable laws (chapter 65) merely because the Legislature gave him more explicit authority elsewhere.

**c.** Appellants' precedent fares no better, as in those cases the Attorney General lacked a basis for suing at all. For example, in *Hill v. Lower Colorado River Authority*, the court of appeals determined there was no statutory basis for the Attorney General to challenge a determination of the Texas Water Rights Commission. 568 S.W.2d 473 (Tex. App.—Austin 1978, writ ref'd n.r.e.). In *State ex rel. Downs v. Harney*, the court of appeals likewise determined that "[t]here is no provision . . . either in the Constitution or statutes empowering the Attorney General to institute proceedings to remove county officers," with one exception that was not present in that case. 164 S.W.2d 55, 57 (Tex. App.—San Antonio 1942, writ ref'd w.o.m.). Appellants do not point to a case in which a statute provides the Attorney General with a cause of action for civil penalties but the court nevertheless concluded that the Attorney General could not seek an injunction under equitable principles.

Under Appellants' theory, the State is prohibited from seeking an injunction to prevent the unlawful abortion of unborn children. It can only seek civil penalties once

34

the child has been aborted. But there is no requirement for an "applicant for temporary injunction to plead a cause of action that would entitle him or her to the same relief upon determination of the merits." *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) (per curiam). "[T]he issue in determining whether an applicant has met the first qualification for a temporary writ of injunction is not whether the prayer seeking the writ and the ultimate cause of action are 'related,' but whether the applicant has a cause of action at all." *Id.*

Because there is no dispute that the Health and Safety Code and Occupations Code provide causes of action under which the Attorney General brought this case, the Attorney General may seek injunctive remedies consistent with equitable principles to prevent the loss of unborn life.

### B.  The Attorney General may bring suit in the name of the State.

Appellants also fail to support their argument that the Attorney General may not sue in the name of the State. Their theory appears to be that the Attorney General may seek civil penalties only for himself unless the statute authorizes him to seek them on behalf of the State. But the Attorney General always seeks civil penalties on behalf of the State: It is the State's laws that have been violated. *See* Tex. Gov't Code § 404.094(a) (mandating that penalties collected by state agencies be deposited in the treasury).

Appellants cite *State ex rel. Durden v. Shahan*, 658 S.W.3d 300, 303 (Tex. 2022) (per curiam), but that case does not address whether the Attorney General may bring a suit in the name of the State when suit is authorized. Appellants' Br. at 44. There, the Supreme Court considered whether a county attorney could file suit in the name

of the State alleging violations of the Open Meetings Act, among other things. *Shahan*, 658 S.W. 3d at 302. Finding no statutory authority that would permit "the State" to bring such a suit, the Court held that the "authority to *represent* the state, however, does not necessarily include the authority to independently decide whether to *institute* a suit on the state's behalf." *Id*. at 303. Legislative permission was still required. That is not the case here, where the Legislature has explicitly authorized the Attorney General to bring suit. Tex. Health & Safety Code § 170A.005; Tex. Occ. Code § 165.101.

Appellants cite statutes that explicitly provide that suit may be brought in the name of the State. *See* Appellants' Br. 44. Without citation to authority, Appellants then assert that "[a]t other times, the Legislature gives the Attorney General the authority to sue in his own name and does not authorize him to sue on behalf of the State." *Id.* This distinction is incorrect. Civil penalties are collected on behalf of the State whether the statute says so or not. "[W]hen the Legislature creates a new or additional cause of action in favor of the State it may also constitutionally authorize the Attorney General to prosecute such cause of action in both the trial and appellate courts of the State." *Smith v. State*, 328 S.W.2d 294, 295 (Tex. 1959) (per curiam). Because the Legislature has provided causes of action under which this suit was brought and has authorized the Attorney General to prosecute such causes of action, the Attorney General may properly sue in the name of the State of Texas.

## III. The Trial Court Did Not Abuse Its Discretion in Enjoining Appellants from Performing Abortions or Practicing Medicine.

Finally, Appellants claim that the State did not meet its burden to obtain a temporary injunction. Appellants' Br. 45-53. To obtain its injunction, the State was required to plead and prove "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204. The State has already addressed the first prong: The State had causes of action against Appellants for civil penalties and was permitted to seek temporary-injunctive relief. *See supra* 28-34. Respecting the other two prongs, the State met its burden before the trial court, and Appellants have not shown an abuse of the trial court's discretion.

### A. The State's evidence reasonably supports the trial court's determination that the State is likely to succeed on its claims.

To warrant a temporary injunction, "the applicant is not required to establish that she will prevail on final trial; the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits." *Walling*, 863 S.W.2d at 58 (internal citation omitted). "An injunction plaintiff need not establish the correctness of his claim to obtain temporary relief, but must show only a likelihood of success on the merits." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990). The State met that burden here with evidence that Rojas deceitfully obtained abortion-inducing drugs, firsthand observations of the investigators, and Rojas' repeated invocation of her Fifth Amendment rights, permitting the trial court to draw an adverse inference. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

Appellants offer other theories to explain the evidence, but it was the trial court's decision which side to believe. And its decision must be upheld "unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Butnaru*, 84 S.W.3d at 204. As long as "some evidence reasonably supports the trial court's decision," there has been no abuse of discretion. *Id.* at 211.

### 1. Evidence supports the trial court's decision that the State is likely to succeed in showing that Rojas performed illegal abortions.

It is undisputed that, as a licensed midwife, Rojas is not legally permitted to perform an abortion in Texas. *See* Tex. Health & Safety Code § 170A.002. Thus, the question on appeal is whether there was any evidence to support the trial court's finding that the State is likely to succeed in showing Rojas knowingly performs or attempts to perform abortions. The trial court had ample evidence on which to rely.

### a. Evidence considered by the trial court

*Abortion-inducing drugs:* Rojas used deception to obtain abortion-inducing drugs. Upon Rojas' arrest, officers seized "a pill bottle containing 29 pills of misoprostol" and $2,900 in cash. 2.RR.82-83. Wilkerson explained that "misoprostol is an abortifacient commonly used to induce medical abortions, either alone or in combination with mifepristone." 2.RR.83. The fact that a bottle of misoprostol was seized in her vehicle, and that Rojas invoked her Fifth Amendment right rather than provide any other explanation in the face of such evidence, 1.RR.64-69, permits an adverse inference that she used misoprostol to perform abortions, demonstrating the State is likely to succeed on its claims. For example, Rojas repeatedly invoked her right not

to incriminate herself in response to these questions about the evidence seized during her arrest:

> Q. And you know that [law enforcement] seized a bottle of misoprostol filled with pills from your car, correct?
>
> A. I invoke my rights under the Fifth Amendment.
>
> Q. And you're aware that law enforcement also seized an envelope full of cash next to the misoprostol pills? Are you aware of that?
>
> A. I invoke my rights under the Fifth Amendment.
>
> Q. And, in fact, you have been accepting cash payments in exchange for performing abortions for years since at least 2021, correct?
>
> . . .
>
> A. I invoke my rights under the Fifth Amendment.

1.RR.67-68. If there were some other explanation for what Wilkerson observed and the evidence that was discovered, presumably such evidence could have been presented by Appellants in the trial court, even without testimony from Rojas. "Silence is often evidence of the most persuasive character." *Baxter*, 425 U.S. at 319 (internal quotation omitted). And "(f)ailure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question." *Id.* (internal quotation omitted).

In addition to the misoprostol bottle discovered incident to Rojas' arrest, an empty bottle of misoprostol was discovered at the Telge Clinic when searched under warrant. 2.RR.83. The evidence also showed that Rojas would call in prescriptions for misoprostol using Labanino's provider identifier, would provide a fake patient name and her own information or that of her husband for the patient's birthdate,

address, or phone number. 2.RR.87. Wilkerson stated in his affidavit that he "knows from experience that illicit abortion providers often obtain prescription medications under other individuals' names to avoid detection." 2.RR.83. Appellants acknowledge that the empty misoprostol bottle "had an incorrect patient name on it," Appellants' Br. 19, but otherwise do not explain Rojas' fraudulent use of her and her husband's identifying information along with the fake name.

Again, the trial court was permitted to draw unfavorable inferences from Rojas' silence in the face of this probative evidence. For example, the following questions about the evidence that was presented and Rojas' invocation of the Fifth Amendment give rise to a strong inference that the State is likely to succeed in showing Rojas performed illegal abortions:

- "You have administered misoprostol to women, haven't you?" 1.RR.64, 65.

- "And you have administered misoprostol to end numerous pregnancies; isn't that true?" 1.RR.64, 65.

- "And you are aware that when law enforcement searched your clinic on Telge that they seized an empty bottle of misoprostol? You're aware of that, right?" 1.RR.68.

- "It's true, isn't it, that those bottles of misoprostol were -- you obtained them through fake identities, correct?" 1.RR.70.

- "You fill misoprostol orders through -- by using fake names, correct?" 1.RR.79.

Appellants argue it is significant that investigators did not find mifepristone "or patient records indicating that any patient had received an abortion," Appellants'

40

Br. 20, apparently presuming that Rojas would have kept written records of her unlawful abortions. But Appellants acknowledge that a medication abortion can be accomplished with misoprostol alone, Appellants' Br. 22, and that patient logbooks show payments for "unspecified" services, Appellants' Br. 20, n.8, facts that are entirely consistent with Rojas' performance of illegal abortions with as little documentary proof as possible. In addition, to the extent Appellants argue that misoprostol has uses other than for abortion, Appellants did not provide any evidence of such to the trial court or evidence that Rojas used it for that purpose. Review of the trial court's decision to grant the temporary injunction "must be controlled by the record made in the trial court at the time the injunction was issued." *Morris*, 344 S.W.2d at 429. Appellants cannot supplement it on appeal by asking the Court to take judicial notice of facts they could have presented at the temporary-injunction hearing.

*Officer observations:* Wilkerson determined based on observation that Witness 3 may have obtained an illegal abortion from Rojas. On March 3, 2025, Wilkerson observed Witness 3 enter the Waller Clinic with a male who had been a passenger in the vehicle she was driving. 2.RR.80-81. Rojas arrived a short time later. 2.RR.81. The male and female later exited the clinic, but "[t]his time, the male was observed escorting the female to the passenger side of their vehicle, leaning into the vehicle, and appearing to assist her in getting seated and buckled in." 2.RR.81. Wilkerson thus believed that "the female had undergone a medical procedure or received medical services that left her in a state requiring assistance." 2.RR.81. "Based on the totality of the circumstances and [Wilkerson's] training and experience," Wilkerson

41

"believe[d] that the medical services or procedure in question may have involved an abortion, facilitated by Rojas and [Ley]." 2.RR.81. Wilkerson's affidavit details additional evidence relating to Witness 3, including a lab order, lab report, sign-in sheets, payment notes, and WhatsApp messages consistent with the observation that Witness 3 had obtained an abortion at the clinic. 2.RR.89-94.

When asked under oath to confirm that she performed an abortion in March at the Waller Clinic, Rojas did not deny it but again invoked her right under the Fifth Amendment. 1.RR.86. Rojas was also asked about the evidence of the WhatsApp conversations she had with Ley about Witness 3. For example, she was asked about a response to Ley's message informing Rojas that Witness 3 was coming in for a follow-up: "And in your response you characterized the lab testing results as good, meaning good for you to perform an abortion, correct?" 1.RR.93. Rather than answer, Rojas invoked the Fifth Amendment. The trial judge as factfinder was permitted to infer under these circumstances that Rojas did, in fact, perform an abortion in March at the Waller Clinic.

Rojas also pleaded the Fifth when asked to confirm that she performed an abortion at the Telge Clinic on January 17, 2025, the day that Witness 1 allegedly received an abortion there. 1.RR.76. She did this despite evidence that Witness 1's name and payment details for that date had been found in a patient logbook. 2.RR.83. In light of that evidence, the trial court was permitted to infer based on Rojas' invocation of her Fifth Amendment right that her answer to the question would have been adverse to her interests.

42

*Adverse inference:* As noted throughout this section, Rojas repeatedly invoked her Fifth Amendment rights, rather than answer questions in the face of the State's accusations and evidence. The trial court was therefore at liberty to infer that Rojas' answers to questioning by counsel for the State would have been adverse to Rojas, as she invoked her Fifth Amendment right not to answer and incriminate herself. *Baxter*, 425 U.S. at 318; Tex. R. Evid. 513(a), (c). "[A]side from the privilege against compelled self-incrimination, the [U.S. Supreme] Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause." *Baxter*, 425 U.S. at 319. Texas law is the same—permitting the factfinder to draw adverse inferences from the invocation of the privilege of self-incrimination in a civil proceeding. Tex. R. Evid. 513(c). In this case, when combined with the affirmative evidence against her, the trial court could draw an appropriate adverse inference to support the issuance of the temporary injunction against Rojas and the clinics. *See Wil-Roye Inv. Co. II v. Wash. Mut. Bank, FA*, 142 S.W.3d 393, 406-07 (Tex. App.—El Paso 2004, no pet.) (holding that Texas Rule of Evidence 513(c) applies to a claim of privilege by a party's agent).

### b. Appellants' evidentiary arguments

Appellants' arguments against the State's evidence are wrong. *First*, Appellants argue that a party moving for temporary injunction cannot meet its burden by relying on affidavits. Appellants' Br. 46. Appellants cite a footnote in *State v. Zurawski*, that "[t]he trial court properly excluded affidavit evidence." 690 S.W.3d 644, 654 n.3 (Tex. 2024). But there is no discussion in *Zurawski* as to why the affidavits were properly excluded. The Supreme Court in *Millwrights Local Union No. 2484 v. Rust*

*Engineering Co.* did hold that a temporary injunction may not be based on a sworn petition or affidavit. 433 S.W.2d 683, 686 (Tex. 1968). But courts of appeals have concluded that *Millwrights* is subject to an exception: "[A] trial court may issue a temporary injunction based on affidavit testimony *admitted into evidence* at the hearing thereon." *Pierce v. State*, 184 S.W.3d 303, 307 (Tex. App.—Dallas 2005, no pet.); *see also Morrison v. Gage*, No. 02-15-00026-CV, 2015 WL 4043260, at *4 n.6 (Tex. App.—Fort Worth July 2, 2015, no pet.) (mem. op.); *Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 751 n.3 (Tex. App.—Houston [1st Dist.] 2013, no pet.). In other words, if the plaintiff relies on more than a sworn petition, by entering an affidavit into evidence, the trial court may consider it.

As in *Pierce*, the trial court was correct to admit the affidavits of Wilkerson as evidence at the hearing. Wilkerson's affidavits are probative evidence on which the trial court could rely and support the adverse inferences drawn from Rojas' invocation of her Fifth Amendment right not to incriminate herself.

*Second*, Appellants argue that the admission of Wilkerson's affidavits was an abuse of discretion because they were not authenticated. Appellants' Br. 47. The argument has no merit. Authentication requires the proponent to produce evidence sufficient to support a finding that the item is what the proponent claims it is. Tex. R. Evid. 901(a). Here, the same judge who presided over trial also signed Rojas' arrest warrants. *See, e.g.*, 2.RR.66. The affidavits themselves, attached to the warrants, were also signed by the trial judge and indicate the officer (Wilkerson) was sworn in person. *E.g.*, 2.RR.94. The trial judge stated at the hearing that he knew the affidavits were what they purport to be. 1.RR.107 ("What's the difference between me relying

44

on another Judge signing something or a district clerk stamping it and me actually being the one that signed it? To me, that's even more proof that I know that that's the document."). Thus, Appellants' authentication argument must fail.

*Third*, Appellants assert that the trial court could not draw adverse inferences from Rojas' invocation of the Fifth Amendment because no probative evidence was offered against her. Appellants' Br. 49 (citing *Baxter*, 425 U.S. at 318). But, for all of the reasons described above, probative evidence that Rojas performed abortions was presented. Accordingly, the trial court was allowed to draw an adverse inference from Rojas' refusal to explain the evidence against her.

### c. Evidence that the trial court did not consider

The trial court concluded that it would not consider inadmissible hearsay within Wilkerson's affidavit—primarily the statements of Witness 1 and Witness 3. 1.RR.140. But the trial court could have considered those statements because such statements, made to law enforcement, about knowledge of abortions performed by Rojas or at her clinics are excepted from the hearsay rule as statements against interest. *See* Tex. R. Evid. 803(24).

As counsel for the State explained at the temporary-injunction hearing, 1.RR.118-19, 131-33, Rule 803(24) is not limited to situations where the declarant would be facing criminal or other types of liability for a statement but also applies where a statement could "make the declarant an object of 'hatred, ridicule, or disgrace,'" *Miles v. State*, 918 S.W.2d 511, 515 (Tex. Crim. App. 1996) (quoting Tex. R. Evid. 803(24)). A witness telling a State investigator that she terminated her preg-

45

nancy through an illegal abortion is a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true," Tex. R. Evid. 803(24), because it may expose that person to an investigation to determine who performed or assisted in performing the abortion. In addition, abortion is undoubtedly extremely controversial, and many people on both sides of the issue have strong views. In light of the controversy, it cannot be said that a woman who has had an illegal abortion would have no concern for hatred, ridicule, or disgrace that may arise in admitting to it.

Had the trial court considered the witnesses' statements, it would unquestionably have had sufficient evidence to enter an injunction. As detailed *supra* 4-7, Witness 1 and Witness 3 confirmed to State investigators in this case that Rojas aborted or attempted to abort their unborn children. 2.RR.77 (Witness 1 statement); 2.RR.85-87 (Witness 3 statement). Further, the statements are corroborated by evidence in the record. Witness 1's statement is corroborated by the patient logbook, 2.RR.83, and Witness 3's statement is corroborated by the observations of the investigators during surveillance of the clinics, by records seized pursuant to a lawful search of the clinics, and by the WhatsApp discussions between Ley and Rojas, 2.RR.89-94. Although corroboration is not necessary in a civil case for the exception to apply, it further shows the trustworthiness of the statements and weighs in favor of its consideration at least at the temporary-injunction stage.

Appellants offer little to rebut the statements of Witness 1 and Witness 3. Instead, they offer alternative explanations for the facts—maybe the misoprostol was

prescribed for another reason or maybe Witness 3 was not actually pregnant. Appellants' Br. 47-48. But, again, the evidence in the record establishes that misopristol is used for abortions, 2.RR.83, and the reviewing court is limited to that record, *Morris*, 344 S.W.2d at 429. Further, the trial court was free to choose between two competing factual scenarios: "The decision to grant or deny a temporary writ of injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion." *Walling*, 863 S.W.2d at 58. On review, this Court need only determine that "some evidence reasonably supports the trial court's decision." *Butnaru*, 84 S.W.3d at 211. Appellants also suggest the State should have introduced *more* evidence, but the evidence the State did introduce was sufficient.

Thus, the statements of Witness 1 and Witness 3 to investigators should have been considered by the trial court as statements against interest excepted from the hearsay rule. This is particularly so in the context of a temporary injunction, where the procedures followed are less formal than in a full trial on the merits, given the limited purpose of a preliminary injunction and "the haste that is often necessary" if the relative positions of the parties are to be preserved pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Exec. Tele-Commc'n Sys., Inc. v. Buchbaum*, 669 S.W.2d 400, 402 (Tex. App.—Dallas 1984, no pet.). These witness statements further support affirmance of the trial court's order.[4]

---

[4] Alternatively, if this Court does not affirm the trial court's issuance of the temporary injunction, the Court should direct the trial court that it may consider the statements made to investigators by Witness 1 and Witness 3.

## 2. Evidence supports the trial court's decision that the State is likely to succeed in showing Rojas and her clinics practiced medicine in violation of State law.

Because an abortion may only be performed in limited circumstances under Texas law, and even then only by a licensed physician, Tex. Health & Safety Code § 170A.002, the evidence that Rojas performed or attempted to perform an abortion also shows it is likely to succeed on its practicing medicine claim, Tex. Occ. Code § 155.001. The Court need go no further than that.

But there is additional evidence that was presented to the trial court in support of the State's claim that Appellants have practiced medicine in violation of State law. Citing *Butnaru*'s requirement of pleading and proving, Appellants argue that the State is limited by its petition to demonstrating the unlawful practice of medicine occurred only through unlawful abortions. Appellants' Br. 49-50 (citing *Butnaru*, 84 S.W.3d at 204). But although *Butnaru* states that the applicant must plead and prove a "cause of action," 84 S.W.3d at 204, it nowhere suggests that all acts falling under that cause of action must be pled in the application for injunction itself. Texas is a notice pleading State, and the State provided notice that it believed Rojas was practicing medicine without a license, even if it did not specify each unlawful act.

1. Beginning with Rojas, the trial court was presented with evidence that Rojas holds herself out as a doctor, despite not being a licensed physician in the United States. Her clinic websites listed "Doctor Examination" and "PROCEDURES AND MINOR SURGERY." 2.RR.59, 63. Ley referred to Rojas as "Doctora Maria" in their communications, 2.RR.90-93, and confirmed that "everyone calls her 'Dr. Maria,'" 2.RR.85; *see also* Appellants' Br. 51 (acknowledging "some evidence that

unspecified people referred to Rojas as a doctor"). And he conceded that the clinic's business model was structured around the community believing that Rojas and Ley are physicians. 2.RR.84. Rojas pleaded the Fifth when confronted with this evidence. 1.RR.73, 84-85.

Rojas also did things that amount to the practice of medicine. She did not deny that she told a patient that her baby would likely not survive, without consulting a licensed physician or informing the patient that she was not a physician. 1.RR.89-90. She apparently used Labanino's provider identifier to call in the misoprostol prescription, contrary to the assertion that she could dispense medicine under standing orders from a physician located in Kentucky. 2.RR.87.

**2.** Other individuals associated with the clinics also may have practiced medicine. Ley admitted that, although he is not licensed to practice medicine in Texas, he "provid[ed] services for a man who had a leg injury, by giving him a tablet (analgesic) and ordering an x-ray," consistent with earlier surveillance observations. 2.RR.73, 84.

Surveillance of the clinics and seizure of records revealed licensure information for only one other individual associated with the clinics, Labanino. 2.RR.74. Wilkerson documented "reason to believe that Labanino is being compensated for the use of his medical credentials rather than actively working at the clinic" and was being paid "unofficially." 2.RR.78. There is no record of a collaborative relationship, practice agreement, or delegation agreement between Labanino and a physician.

Appellants' argument that Labanino provided telemedicine services through the unlicensed individuals present at the clinics is undercut by other evidence presented

49

to the trial court. For example, the evidence discussed above, *see supra* 8, that Labanino worked elsewhere undermines the suggestion that he was available for "telemedicine" visits to clients of Rojas' clinics, 2.RR.74, 77. As another example, the WhatsApp messages between Ley, who is unlicensed, and Rojas, show that he was in constant contact with her throughout the day, updating her as to "patients" he had seen at the clinic, suggesting he was not being supervised by Labanino through telemedicine. 2.RR.90-93. As a final example, investigators discovered that Gongora, who was working at the Telge Clinic on March 6 without any known license, communicated with Rojas through voice calls on WhatsApp and had two applications installed on his phone that are "used by medical professionals for clinical decision support." 2.RR.84.

Based on this evidence, the trial court was permitted to conclude that Appellants had engaged in the unauthorized practice of medicine. Under the proper standard of review, the trial court's injunction was not "so arbitrary that it exceeded the bounds of reasonable discretion" and so must be sustained. *See Butnaru*, 84 S.W.3d at 204; *see also Loye v. Travelhost*, 156 S.W.3d 615, 619 (Tex. App.—Dallas 2004, no pet.) ("In reviewing the trial judge's decision, we draw all legitimate inferences from the evidence in the light most favorable to the trial court's judgment.").

## B. The performance of illegal abortions or practice of medicine without a license at Rojas' clinics demonstrates a probable, imminent, and irreparable injury.

In this case, the same evidence showing the State is likely to succeed in proving its claims that Rojas and her clinics perform illegal abortions and practice medicine

in violation of State law, also demonstrated to the trial court that the State would suffer a probable, imminent, and irreparable injury without a temporary injunction. Appellants do not challenge that the injury to the State's sovereign interests is irreparable or that the injury from an illegal abortion is necessarily irreparable, as determined by the trial court. CR.13. And, as explained above, *see supra* 20-22, those are irreparable injuries.

Instead, Appellants appear to contend that there is no evidence that the violations will continue in the future. But if Rojas was willing to violate the law in the past, and then plead the Fifth to avoid answering questions about it, the trial court was permitted to conclude that an injunction would be necessary to keep her from violating the law in the future. The violations that the State is likely to succeed in showing are occurring at a network of clinics that Rojas operates for this purpose. They are not isolated incidents occurring based on specific circumstances unlikely to arise again. Thus, this case involves much more than "fear or apprehension of the possibility of injury." *Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246, 248 (Tex. 1983). And, even if Appellants now plan to somehow alter operation of the clinics so as not to perform abortions or practice medicine in violation of State law, that only shows the necessity of the injunction. It was not an abuse of discretion for the trial court to temporarily enjoin Appellants from such violations of State law pending trial on the merits.

## Prayer

The Court should affirm the trial court's order granting Texas' application for temporary injunction. The State requests all other relief to which it is entitled.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

/s/ Jeffrey A. Stephens
JEFFREY A. STEPHENS
Assistant Solicitor General
State Bar No. 24117441
Jeff.Stephens@oag.texas.gov

BETH KLUSMANN
Assistant Solicitor General

Counsel for Appellee

## Certificate of Compliance

Microsoft Word reports that this brief contains 13,956 words, excluding exempted text.

/s/ Jeffrey A. Stephens
JEFFREY A. STEPHENS

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nancy Villarreal on behalf of Jeff Stephens
Bar No. 24117441
nancy.villarreal@oag.texas.gov
Envelope ID: 102613752
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250630 Rojas AppelleeBr_FINAL
Status as of 7/1/2025 7:11 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Katherine Treistman | 796632 | Katherine.Treistman@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |
| Marc Hearron | 24050739 | MHearron@reprorights.org | 6/30/2025 5:36:01 PM | SENT |
| Thomas Hudson | 24126650 | matt.hudson@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |
| Leah Schultz | 24126910 | leah.schultz@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |
| Abby Lynn Parsons | 24094303 | abby.parsons@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 6/30/2025 5:36:01 PM | SENT |
| Jenna Hudson | | jhudson@reprorights.org | 6/30/2025 5:36:01 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |
| Catherine Hodges | | catherine.hodges@aporter.com | 6/30/2025 5:36:01 PM | SENT |
| Grace Ojionuka | | grace.ojionuka@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/30/2025 5:36:01 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy Hilton | 24097834 | Amy.Hilton@oag.texas.gov | 6/30/2025 5:36:01 PM | SENT |
| Beth Klusmann | | beth.klusmann@oag.texas.gov | 6/30/2025 5:36:01 PM | SENT |
| Jeffrey Stephens | | jeff.stephens@oag.texas.gov | 6/30/2025 5:36:01 PM | SENT |